FULLER, Appellant, v. KROGH, Respondent.

*November 30, 1961—January 15, 1962.*

414

416

For the appellant there were briefs by *Cohen & Parins* of Green Bay, and oral argument by *Robert J. Parins* and *Steven I. Cohen.*

For the respondent there was a brief by *Davis, Soquet, Cherney & Ross* and *Kaftan, Kaftan & Kaftan,* all of Green Bay, and oral argument by *J. Robert Kaftan* and *Donald E. Soquet.*

HALLOWS, J. The appellant is satisfied with the trial court's findings on the accounting issue excepting for the allowance of $4,000 for Krogh's supervisory services which he contends was arrived at by speculation. In making this finding, the trial court considered the estimated 1,428 hours spent by Krogh (during part of this time he was paid as an employee of Norcor), the nature of the work, and Fuller's expectation that Krogh would be paid for such work. Henkelmann testified supervisory work of this nature was worth $3.65 an hour. Fuller testified Krogh put in a considerable amount of time in excess of that which would have normally been put in by an owner or officer of the corporation. True, there is no testimony of a $4,000 figure. How-

ever, the court, as trier of the facts, could have reasonably found a substantially higher amount for Krogh's services. The determination of $4,000 was not the result of conjecture or speculation but a finding of reasonable value based on evidence.

The contention of the appellant that Krogh was not entitled to any compensation for his supervisory services because he was a director and officer of Cormier is without merit. The services were not those usually performed by a director or officer of this type of corporation, nor was he under any duty or obligation as an officer or director to perform them. The services were performed on the understanding with Fuller that Krogh would be paid for them. The appellant's contention would prevent a director or officer of a corporation from contracting with that corporation to perform services for compensation outside of the scope of his official duties. The cases relied upon by the appellant are not applicable.

This disposition of the first cause of action controls the determination of the second cause of action alleging the certificates received by Krogh should be canceled as void because not fully paid for. Certificates No. 17 for 84 shares and No. 23 for 50 shares were issued to Krogh for cash and were fully paid. The fact Krogh owed Cormier $12,500 did not prevent him from contributing to the capital of the corporation. Fuller was in the same position. There was no agreement Krogh and Fuller would pay their obligations to Cormier instead of investing their money. Certificates Nos. 12, 13, and 22, totaling 175 shares, were received in part payment of Krogh's claim for materials, supplies, and labor he furnished the corporation. The claim having been determined to be in excess of the amount of stock and the amount of money received by Krogh, the consideration for these shares was fully paid.

The most-important issue on this appeal is whether Fuller had pre-emptive rights to purchase stock previously authorized but unissued and, if so, whether he had waived those rights. He seeks to require Krogh, now the controlling stockholder, to cause the corporation to offer Fuller sufficient shares of stock to equalize his holdings with Krogh. The first argument of the appellant to attain this result is based on a purported agreement he had with Krogh when the corporation was organized to match Krogh dollar for dollar. The trial court found no such contract existed. In its decision, the trial court stated that if such an agreement existed, the plaintiff violated and terminated it by failing to match the defendant's contributions. Fuller admits the agreement was ambiguous but relies on the fact that up to December, 1954, both he and Krogh had issued to themselves 218 shares of stock, payments for which were periodically made by each and equalized by April of 1955. However, the equalization ends there.

After the issuance of the last of the 218 shares, Fuller and Krogh dealt on a different basis. Circumstances had changed. When the certificate for 84 shares was issued to Krogh for cash, only 25 shares were issued to Fuller for cash. There was no matching of dollars. Nor was there any matching of dollars when Krogh invested $5,000 for 50 shares. These transactions were fully known and understood by Fuller. He was president at the time, signed the stock certificates, and testified he did not match Krogh because he did not have the money. The trial court's finding on this point is not against the great weight and clear preponderance of the evidence and is sufficient to determine the claim of Fuller, even if the existence of the agreement were in doubt. If Fuller has any claim to equalize his stockholding with that of Krogh, it must be found in his pre-emptive right as a stockholder.

A pre-emptive right of a shareholder in a corporation is recognized so universally as to have become axiomatic in corporation law. The doctrine was firmly established in this state by *Luther v. C. J. Luther Co.* (1903), 118 Wis. 112, 94 N. W. 69, and *Dunn v. Acme Auto & Garage Co.* (1918), 168 Wis. 128, 169 N. W. 297, and recognized at least as early as 1876 in *Dousman v. Wisconsin & Lake Superior Mining & Smelting Co.* (1876), 40 Wis. 418. Generally, the pre-emptive right of a stockholder is his right to retain and maintain his relative and proportionate voice and influence in the control and management of the affairs of a corporation by purchasing an amount of capital stock to be issued and sold by the corporation proportionate to his then holdings before the stock can be sold to others, whether they be outsiders or stockholders. *Luther v. C. J. Luther Co., supra; Hammer v. Cash* (1920), 172 Wis. 185, 178 N. W. 465; 13 Am. Jur., Corporations, p. 309, sec. 186.

The right exists whether the stock issued represents an increase in the authorized capitalization of the corporation or represents previously authorized but unissued stock. *Levy v. Sattler* (1919), 169 Wis. 308, 172 N. W. 738; 11 Fletcher, Cyc. Corp. (perm. ed.), p. 287, sec. 5135; Anno. 52 A. L. R. 220. On principle, the right also extends to a reissue of stock once issued, purchased, and canceled by the corporation so as to reduce its capitalization. See *Dunn v. Acme Auto & Garage Co., supra.* In that case, it is also pointed out if the stock purchased by the corporation had been carried upon its books as a liability and treated as an asset, the pre-emptive right might not attach, but the directors in disposing of such shares could only do so in the honest exercise of their discretion and with the utmost good faith for the benefit of all shareholders and not so as to give one group of shareholders a benefit or advantage over another. In *Dunn,* reference to treasury stock and to stock

treated as an asset is misleading. Effective in 1953, our corporation laws, after extensive study, were revised and modernized as Wisconsin Business Corporation Law. Treasury stock is now defined by sec. 180.02 (8), Stats.,[1] to mean shares which have been reacquired by the corporation and have not been canceled and returned to the status of authorized but unissued shares, and as issued shares but not outstanding shares. Sec. 180.02 (10) [2] defines "Stated capital." It is not contemplated that its own shares are to be carried on the corporation's balance sheet or books as assets. For the treatment of treasury shares from an accounting standpoint to reflect relationship to stated capital, see Luce, The Wisconsin Business Corporation Law, 36 Marquette Law Review (1952), 1. The pre-emptive right exists where the corporation acquires its stock and cancels or returns it to the status of authorized but unissued shares, but does not exist as to treasury shares which are considered issued but not outstanding. The pre-emptive right exists only upon the issuance of shares of stock, which is not to be confused with the certificate evidencing the ownership of shares of stock.

---

[1] "(8) 'Treasury shares' means shares of a corporation which have been issued, have been subsequently acquired by and belong to the corporation, and have not, either by reason of the acquisition or otherwise, been canceled or restored to the status of authorized but unissued shares. Treasury shares shall be deemed to be 'issued' shares, but not 'outstanding' shares."

[2] "(10) 'Stated capital' means, at any particular time, the sum of (a) the par value of all shares of the corporation having a par value that have been issued, (b) the amount of the consideration received by the corporation for all shares of the corporation without par value that have been issued, except such part of the consideration therefor as may have been allocated to capital surplus in a manner permitted by law, and (c) such amounts not included in (a) and (b) of this subsection as have been transferred to stated capital of the corporation, whether upon the issue of shares as a share dividend or otherwise, minus all reductions from such sum as have been effected in a manner permitted by law."

*Dunn* extends the purpose of pre-emptive rights to the protection of the shareholder's financial interests, *i.e.,* his proportionate interest in the net worth of the corporation. The pre-emptive right is regarded as inherent in the stockholder's status, is appurtenant to the stock, belongs to the owner, and its existence is not dependent on the articles of incorporation. *Estate of Merrill* (1928), 196 Wis. 351, 220 N. W. 215; *Steven v. Hale-Haas Corp.* (1946), 249 Wis. 205, 23 N. W. (2d) 620, 23 N. W. (2d) 768. Thus, preemptive rights exist for the purpose of protecting the shareholder's interest in his control or proportionate voting rights and in his proportionate investment and interest in the net worth of the corporation. For the nature of rights and accompanying problems, see Anno. 52 A. L. R. 220; Anno. 138 A. L. R. 526; 11 Fletcher, Cyc. Corp. (perm. ed.), p. 279, sec. 5135; Drinker, The Pre-emptive Right of Shareholders to Subscribe to New Shares, 43 Harvard Law Review (1930), 586.

The pre-emptive right of a shareholder, however, has well-recognized limitations. The articles of incorporation may limit or deny the right. Sec. 180.21, Stats. No limitation or denial appears in Cormier's articles. Pre-emptive rights are often not preserved in large corporations whose stock is held by the public generally and are seldom denied or restricted in small or closely held companies. The right, it has been said, is subject to the general restriction that its exercise must be consistent with the objective which the stock increase is legally designed to accomplish. 11 Fletcher, Cyc. Corp. (perm. ed.), p. 293, sec. 5136, quoted with approval in *Milwaukee Sanitarium v. Lynch* (1941), 238 Wis. 628, 300 N. W. 760. When the new stock is to be issued for money needed for corporation purposes, the pre-emptive rights are generally recognized. However, when new stock is to be issued for property or for services, the

authorities are in disagreement. Fletcher takes the view in such cases that the pre-emptive right commonly is not recognized or is recognized to a limited extent only. Perhaps the leading case denying pre-emptive right to stock exchanged for property is *Stokes v. Continental Trust Co.* (1906), 186 N. Y. 285, 78 N. E. 1090. See also Morawetz, The Pre-emptive Right of Shareholders, 42 Harvard Law Review (1928), 186, 197. For the view that pre-emptive rights should not be denied where stock is issued in exchange for property, see Frey, Shareholders' Pre-emptive Rights, 38 Yale Law Journal (1929), 563, 579; Drinker, 43 Harvard Law Review (1930), 586, 604.

On principle, it would seem the pre-emptive right of a shareholder should not be denied when property is to be taken as consideration for the stock excepting in those peculiar circumstances when the corporation has great need for the particular property, and the issuance of the stock, therefore, is the only practical and feasible method by which the corporation can acquire it for the best interest of all the stockholders. On this reasoning, the court in *Milwaukee Sanitarium v. Lynch, supra,* said stock, free from pre-emptive rights, could be sold and given in exchange for services of an assistant medical officer of the sanitarium to procure such services upon which its success depended. On the grounds of practical necessity only can such exception or limitation be founded. However, in the *Lynch Case,* the determining factor for the decision was the fact that the articles had been validly amended denying the pre-emptive right to the shareholder in such case under certain conditions which were met.

Krogh argues *Milwaukee Sanitarium v. Lynch, supra,* applies and Fuller had no pre-emptive rights because the 175 shares were issued for property and services desperately needed by Cormier. We find no agreement to exchange

property or services for stock or that Cormier could only secure such material and services for Cormier on the basis of stock. The understanding was that Krogh would not press for payment of his claim. Later he was willing to accept stock in lieu of cash when Cormier was unable to pay. The reasoning of the *Lynch Case* does not require the denial of pre-emptive rights here where stock was issued in payment of a pre-existing debt. In the cases of stock issued in payment of a pre-existing debt, we do not see any reason why pre-emptive rights should be denied. A debt calls for payment in money which the recognition and exercise of the pre-emptive rights would furnish. See *Hodge v. Cuba Co.* (1948), 142 N. J. Eq. 340, 60 Atl. (2d) 88. We, therefore, hold that Fuller had pre-emptive rights not only when Krogh was issued stock for money but also for his claim.

The question now is whether Fuller waived those rights. The appellant argues he did not because the directors of Cormier did not offer shares of stock to him and, therefore, he had no opportunity to purchase his proportionate share. A shareholder having pre-emptive rights is entitled to the opportunity to purchase his proportionate share. In cases where the shareholders do not know or have notice of the intended issue of stock, such opportunity must be afforded by notice and by fixing a reasonable time within which the shareholders may exercise such right. The cases cited by the appellant for the proposition that directors of corporations must first offer shares of stock to shareholders apply in principle but not in mechanics to the facts of this case. At the time the stock was issued, Fuller and his wife constituted the majority of the board of directors and Fuller was president. He signed the certificates. He knew of each transaction for the issuance of stock and the reason therefor. As a director and president, he had as much duty as Krogh, if not more, to go through the formality, if required, of

offering the stock to himself as a stockholder. He was aware of his pre-emptive rights and of the intended issues of stock to Krogh; and under the circumstances he and Krogh dealt with each other and with the corporation, he had notice and the opportunity to exercise his pre-emptive rights, which he did not within any reasonable time. We can only conclude he waived his rights. For cases sustaining waivers of pre-emptive rights, see Anno. 138 A. L. R. 526, 529.

It is contended Fuller intended to equalize his stockholdings as soon as Krogh furnished an accounting, and claims both he and Krogh understood he need not equalize the stock until the accounting was made. We do not find sufficient evidence in the record to substantiate such a theory of Fuller's nonaction. Neither does it explain why an accounting was necessary in order to exercise his rights when Krogh invested cash.

A more-serious contention of the appellant is that Krogh gained control of the corporation through fraud by his failure to disclose the true amount of his claim against the corporation. The trial court found the charge of fraud was not sustained. We have carefully analyzed the facts in the record and the trial court's finding is not against the great weight and clear preponderance of the evidence nor do we believe it could reasonably come to the opposite determination. This is not a case of Krogh's submitting or billing the corporation for seven different amounts at various times. Krogh's bookkeeping leaves much to be desired, but so does the arrangement under which he worked. By agreement, he was to receive for his materials and labor whatever he would be willing to sell them for to others. In furnishing labor and material, he was dealing with two of his own companies. Much of the confusion in the evidence and the arguments predicated upon it arise from different theories or methods of how Krogh was to figure his claim.

The first statement of the amount owing Krogh was prepared both by Fuller and Krogh to obtain the loan from the Kellogg-Citizens National Bank. Some later statements were incomplete and did not include his markup. Other statements, it is true, contained some errors and mistakes. In 1956, Fuller caused an audit of the books to be made. The auditors reported the records were incomplete with reference to the shares of stock issued to Krogh. Krogh, then, in the spring of 1957, presented a detailed list of materials furnished at cost and the amount of labor paid by him. This statement included a supervisory 15 per cent override on the entire cost of the building. Fuller admitted at the trial that lists, corresponding in many respects to this list, had been submitted to him in 1955 and were in his possession, but he failed to produce them at the trial, saying he was unable to find them. The auditors did not know of the existence of such lists at the time of their audit. Fuller claims he submitted the lists to the auditors. The trial court found he did not. The fact remains Krogh did not receive stock and cash payments in excess of the amount of his claim as determined by the trial court.

Because of the varying amounts of Krogh's claim, Fuller argues he was deprived of a fair opportunity to equal Krogh's stock investment. We find no merit in this assertion. When the certificates for 75 shares were issued in January, 1955, they were on account. At that time, nothing prevented Fuller from exercising his pre-emptive rights and investing $7,500 in the corporation. At that time, Fuller knew approximately the amount of Krogh's claim because he had helped to prepare it for the bank statement as the corporation was in financial difficulties and needed the money. For like reasons, Fuller waived his pre-emptive rights to match Fuller's investment when he received 100 shares. There is testimony that when Krogh received the 100 shares of stock,

they were issued in settlement of Krogh's account. But even if Fuller's contention were true that the stock was not in extinguishment of the claim, he still was not misled and should not have signed the certificates or should have exercised his pre-emptive right within a reasonable time. The cases cited by the appellant on the question of fraud and deceit are not applicable to the facts here presented.

The appellant insists he relied on Krogh's statements at first and then became suspicious and resisted the issuance of the stock and his failure to exercise his pre-emptive rights was caused by Krogh's false statements and Krogh failed to act in good faith and in fairness or make a full disclosure of all facts. We do not find support for this contention in the record.

The appellant in his last argument insists a court of equity should aid him in securing an equal stockholding with Krogh because Krogh's action made his prior performance impossible. This argument is partly based on the purported agreement to match Krogh dollar for dollar, and partly on the ground he should now be allowed to exercise his pre-emptive rights. When Cormier was tottering on the brink of bankruptcy, Krogh took the financial risk by investing money and by taking stock for his claim. Fuller had an opportunity to exercise his pre-emptive rights but did not. Cormier is no longer a financial risk and circumstances have changed. We find no equitable grounds in the facts upon which a court of equity should now allow Fuller to exercise his pre-emptive rights.

The appellant suggests *Moha v. Hudson Boxing Club* (1916), 164 Wis. 425, 160 N. W. 266, is closely in point. There, the plaintiff, a professional boxer, agreed to box 10 rounds as an exhibition under the revised Marquis of Queensberry rules as interpreted by the referee. In the middle of the second round, in violation of the rules, he struck

a blow below the belt which disabled his opponent and thus, by his own act, made substantial performance impossible. The court denied recovery to the plaintiff for his services. Appellant submits Krogh's acts amount to a low blow. We do not agree. More apropos to the facts is the childhood story of The Little Red Hen and The Grain of Wheat.

*By the Court.*—Judgment affirmed.

GORDON, J., took no part.