Argued June 8, reversed November 29, 1967, petition for
rehearing denied January 23, 1968

BROWNING ET AL, *Appellants, v.* C & C PLY-
WOOD CORP. ET AL, *Respondents.*

434 P. 2d 339

*Asa L. Lewelling,* Salem, argued the cause and
filed a brief for appellants.

*Arthur C. Johnson,* Eugene, argued the cause for respondents. With him on the brief were Johnson, Johnson & Harrang, Eugene.

Before PERRY, Chief Justice, and SLOAN, GOODWIN, DENECKE and HOLMAN, Justices.

SLOAN, J.

In early 1963 defendants Campbell, Winn and Riddlesbarger, as the majority stockholders and directors of defendant C & C Plywood Corp., successfully culminated a plan to increase the capital stock of the defendant corporation. The recapitalization of the corporation virtually eliminated plaintiffs' previously owned 32 percent of the outstanding stock. Plaintiffs, alleging that defendants' acts were illegal, fraudulent and oppressive,[1] filed this suit, seeking to be restored to their 32 percent interest in the corporation. The trial court dismissed plaintiffs' suit and they appeal. Although plaintiffs owned the stock as partners and present their claim as a unit, plaintiff Browning was the active participant in the affairs of the corporation, so for the purposes of this opinion we will refer to him as the active plaintiff.

C & C Plywood Corp., was originally organized in 1959. Its purpose was to develop a site in Kalispell, Montana, into a plywood mill. Defendant Campbell was the organizer and financier of the corporation.

---

[1] ORS 57.595 provides in part:

"(1) The circuit court shall have full power to liquidate the assets and business of a corporation:

\* \* \* \* \*

"(B) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or \* \* \*."

Browning was the finder. His job had been to locate the site for a plywood mill and its supporting timber resources and to participate in the construction of the mill. For this he was awarded 32 percent of the stock in the corporation. Defendants Winn and Riddlesbarger were the trustees of two trusts that Campbell had caused to be established at some previous time for the ostensible benefit of his two daughters. From the inception of the corporation the two trustees were the owners of a majority of the stock. The trustees also loaned the corporation large sums of money from the trust estates. The trustees acted in concert with Campbell, if not at his command. Defendant Thomason was the only other stockholder. He acted in concert with the directors.

When the corporation was first organized it had authorized capital stock of 1,000 shares of no par value stock. Each of the two trusts became the owner of 250 shares of this stock, Campbell acquired 20 shares, Thomason had 160 and Browning became the owner of 320 shares.

There was considerable evidence at the trial relative to Browning's alleged failure to participate in the construction of the mill. This evidence, by both sides, was apparently aimed at proving whether or not Browning did perform the contract by which he became entitled to the 32 percent interest in the corporation. For our purposes we view that evidence as irrelevant. This was not a suit to decide that question. The significant fact is that when the recapitalization took place, Browning was recognized as the owner of 32 percent of the stock. The question in this case, as stated in defendants' brief is: "Whether the defendants committed any wrong or breached any duty to

the plaintiffs in the increase of the capitalization of C & C Plywood Corp.?"

To explain the increase of the stock it is necessary to mention that the corporation began operation of the mill in February 1960. It operated at a loss until sometime after its fiscal year which ended on July 31, 1962. The annual report of the financial status of the corporation at that date showed an operating deficit of more than $200,000. The corporation was then indebted to the two trusts for almost one-half million dollars. The debt was secured by mortgages on the corporation's physical assets. By the end of the fiscal year ending July 31, 1963, the corporation had a profit. At what time in the fiscal year it could have been foreseen that the corporation was emerging into profitable operation is not found in the record. It is possible to infer that sometime during that fiscal year the defendant-directors could have known that the organizational and operational problems of the corporation's business had been resolved and that future profitable operation could have been anticipated.

In any event, the individual defendants caused a special meeting of the stockholders to be called for October 29, 1962. Browning received notice of the meeting but did not attend. At the October 29th meeting the stockholders approved a resolution to increase the number of shares of the corporation from 1,000 to 500,000 shares. Thereafter, the directors proceeded to take the action necessary to accomplish this purpose. On December 14, 1962, the corporation issued a pre-emptive Stock Allotment Certificate to Browning and, presumably, the other stockholders. This certificate informed Browning that he was qualified to subscribe to 151,696 shares of the newly authorized stock at one dollar per share. The certificate informed

Browning that "Unless the certificate is surrendered at [the corporation office] of the Secretary-Treasurer on or before January 17, 1963, accompanied by payment in full, the rights will be void and this certificate of no value or effect." The defendant-directors knew that it was financially impossible for Browning to exercise this pre-emptive right, either in full or for any substantial part of it. It was, and was intended to be, an eviction notice.

It makes no difference whether or not the certificate of pre-emptive notice directed to Browning did lawfully compel him to subscribe and pay for the full 150,000 shares or none, although Browning considered that this was the effect of the certificate. It is important in assessing the evidence, because it did require Browning to expend a substantial sum to retain any meaningful proportionate interest in the corporation. It is also important because the offer contained in the certificate was considered by the defendants as the only chance Browning could have to preserve his proportionate interest. It is apparent from the record that this was the purpose of the notice and that it accomplished its purpose. Since defendants well knew that Browning could not exercise his pre-emptive right, or any appreciable part of it, it is clear that defendants had no intention of exercising the pre-emptive rights they were entitled to, and they did not do so. They had another plan.

The plan was consummated at a special meeting of the Board of Directors held on February 11, 1963, immediately following the expiration of the pre-emptive right period; the design to eliminate Browning was completed. At that meeting the defendant-directors authorized all of defendant stockholders a right to subscribe for any amount of the new stock at one

dollar per share. Browning was given no notice of this meeting nor of the opportunity thus afforded the other stockholders. The freeze-out was completed on February 17, 1963, at which time each of the two trusts was issued 10,454 shares. This was paid for by reducing the debt of the corporation[2] to the trustees in this comparatively small amount. This is to be contrasted with 125,000 shares each trust was given a pre-emptive right to buy. Campbell was issued 32 shares, and later defendant Thomason was issued 10,240 shares. As a consequence, Browning's interest in the corporation was reduced from 32 percent to one percent. He was not, of course, given any opportunity to subscribe for the drastically reduced amount of stock that would have retained his proportionate share.

The minutes of the February 11th special meeting of the directors reveal statements intended to justify this subrosa transaction. It was stated that it was necessary to permit the trustees to have a greater participation in the profits and to permit cancellation of overdue corporation notes due them as trustees. It was also recorded in the minutes that both Campbell and Thomason had worked diligently for the corporation and should be entitled to enhance their holdings on such "reasonable terms as the officers in their discretion might determine." Thomason was permitted to exchange a claim for unpaid salary for his shares. Browning should have been given the same opportunity. He, too, had an unpaid salary claim which, even though disputed, obviously had some value.

Defendants testified at the trial that the need for

---

[2] It is not clear how this was done. It appears that defendants may have caused the corporation to pay the trustees the needed amount, and the trustees in turn used this money with which to buy the stock.

the additional paper capitalization was to enable them to permit public sale of the stock; to provide a better ratio between capitalization and debt; and to enable Browning to financially participate in the corporation. The difficulty with accepting these explanations, both in the minutes of the February 11th meeting and in the testimony, is that none of them were accomplished, or even attempted.

There is no evidence to indicate the slightest attempt to make the stock available to the public. The large debt of the corporation was not materially reduced. The ratio of debt to the paid-in capital stock was only nominally changed. Browning was prevented from additional financial participation in the corporation by the limitation on persons permitted to buy at the special sale of February 11, and defendants did not attempt to explain how the increase of the stock authorized at the February 11th meeting accomplished any of the business purposes they claimed for the entire transaction. The only tangible result of the increase of the stock and the amount issued was the elimination of Browning's 32 percent interest in the corporation.

There is other evidence which supports the conclusion that this was the defendants' purpose. Some of the witnesses testified that one or more of the defendants had stated to the witnesses that this was the intended purpose. The minutes of the meetings of the directors of the corporation, held before the increase in capital stock was proposed, show that defendant Campbell desired to eliminate plaintiff as a stockholder by simply denying that he had any stock. The latter evidence emphasizes without contradiction that Campbell wanted to oust Browning as a stock-

holder. It may have been that there was some reason for defendants to have believed that Browning had breached the agreement which entitled him to 320 shares of the original stock. But defendants did not see fit to attempt to eliminate his stock by any action to establish their right to cancel the stock. Instead, they proceeded by the method described. The amount of the increase of the stock from 1,000 shares to 500,000 in contrast to the small portion that was issued with no addition to the capital of the corporation is, of itself, evidence of the purpose.

■ No cases have been cited or found which are directly comparable to the precise problem presented by this case. Most of the cases concern the right of a minority stockholder to enjoin the issuance of additional stock. See Annotation, 38 ALR2d 1366 (1954). These cases are not particularly helpful to the instant problem. O'Neal & Derwin, Expulsion or Oppression of Business Associates, "Squeeze-Outs in Small Enterprises," (1961), passim, and beginning particularly at page 91, as the title implies, provides the best analysis of the few cases that are relevant to the question at hand. The authors examine the reluctance of the courts to interfere in intra-corporate disputes but also find that courts have given relief when the purpose of the increased stock issue is only for the benefit of the majority and serves no corporate purpose. In the instant case the only demonstrable purpose served by the increase of stock was to provide the tools with which to drastically reduce the interest of Browning in the corporation. We are convinced by the evidence that this was done to eliminate Browning as a stockholder and that this purpose was wrongful and oppressive.

■ Defendants have argued that Browning was not entitled to relief because he failed to exercise any of his rights as a stockholder to obtain intra-corporate relief. The only thing suggested by defendants that he could have done was to protest. It is obvious that any protest would have been unavailing.

■ The relief to which Browning is entitled presents a difficult problem. He prayed for the appointment of a receiver for the corporation and for its dissolution to award him a 32 percent interest in the proceeds of the dissolution as permitted by ORS 57.595, quoted supra. This is an untenable request. But this is not the only remedy available to the court. The most obvious relief would be to cancel the stock increase and restore the stockholders to their former proportionate status. This may not be appropriate because some of the defendants appear to have pledged their stock to other persons who are not parties to this proceeding. And, the defendants did give consideration for the additional stock issued to them. However, the evidence is not sufficient to enable us to determine what the precise relief should be. The trial court should take such additional evidence as may be necessary to determine the appropriate relief. It appears to us that if a return to the prior status quo is not feasible, then that plaintiff should have damages or be entitled to buy sufficient stock at $1 per share to enable him to retain his 32 percent interest in the corporation, and, if the court should find this to be the appropriate relief, then Browning is entitled, like defendant Thomason, to apply in payment of the stock, such amount, if any, as the court may find that the corporation owes to Browning for unpaid salary.

Reversed.

DENECKE, J., dissenting.

The issue is whether the majority shareholders lawfully can dilute a minority shareholder's interests in a close corporation by authorizing the issuance of additional stock and then purchasing a portion of such stock.

This court has not passed upon any problem in this field. The predominant view of other jurisdictions has been expressed as follows:

> "On the whole, the courts have been surprisingly reluctant to prevent the dilution of a minority shareholder's interest through the issuance of new stock to majority shareholders at an inadequate price or at a time when the minority shareholder is unable to buy his proportionate part of the new issue. This reluctance to grant relief to minority shareholders has been explained as being based partly on the 'general judicial policy of refusing to interfere in the internal affairs of a corporation.'" O'Neal and Derwin, Expulsion or Oppression of Business Associates, 94, § 4.14 (1961).

O'Neal and Derwin, Expulsion or Oppression of Business Associates, supra, are of the opinion that the decision most favorable to minority stockholders is *Bennett v. Breuil Petroleum Corp.*, 34 Del Ch 6, 99 A2d 236 (1953). That decision was that judicial relief would be granted to minority stockholders if the main purpose of the issuance of additional stock was to "squeeze out" the minority.

In my opinion the rule should be that if there is any legitimate corporate purpose that would have been served by the action of the majority stockholders, the minority stockholders can obtain no judicial relief unless the minority is able to prove by a high quantum of evidence that the legitimate corporate pur-

pose was not the motivation of the majority, but, rather, its purpose was to squeeze out the minority stockholders:

> " '* * * To warrant the interposition of the court in favor of the minority shareholders * * *, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company, and in a manner inconsistent with its interests.' " *Bellows v. Porter,* 201 F2d 429, 433-434 (8th Cir 1963).

Any other standard would unduly restrict the wide latitude that should be given corporate management which bears the risk of the success or failure of the business, and would substitute the judgment of a court which has no stake in the enterprise.

Judged by this criterion I am of the opinion that the plaintiffs cannot prevail.

In October, 1962, when the additional stock was authorized, the only financial information in evidence is that the company had a cumulative deficit of $200,000 and an operational loss for the previous year of $27,000; current liabilities were $227,000 against current assets of $117,000, including cash of $14,000. Capital stock was $1,000 and long-term loans were $440,000. Three hundred twenty thousand dollars of the loans was from the two trustee stockholders and was secured by mortgages on the plant and equipment. Sales were $2,300,000 and expenses in excess thereof.

The trustees' only source of funds were payments in the amount of $12,000 per month from Camac

Veneer, Inc., pursuant to a contract. All of these receipts were immediately turned over to C & C. Defendant Riddlesbarger testified: "And the inability of Camac Veneer, Inc., to continue to pay was always subject to question. We were having trouble, they were a new venture, they were inexperienced * * *."

It seems obvious that at this time the corporation needed further capital, whether it was in the form of money received from the purchase of additional stock or from additional loans.

On the basis of the financial picture, conventional loans would not appear available unless personal guarantees were made or the trustees subordinated their mortgage. A federal Area Redevelopment Administration loan in the amount of $200,000 was applied for but was not obtained because of the action of the Governor of Montana.

It was also probable that the present stockholders were going to have to contribute at least a part of the necessary capital or it would not be forthcoming. Defendant Winn, one of the trustees, stated, in effect, that the majority stockholders expected the plaintiffs to contribute their share of the needed capital and not get a "free ride." The necessary corollary to this is that if the plaintiffs could not contribute, their interest would be diminished. This motivation of requiring all stockholders to assist in meeting capital requirements should not be a basis for judicial relief for minority stockholders.

If the majority stockholders were to furnish at least part of the needed capital, they could do it by purchasing more stock or making further loans. The inadvisability of the latter course is apparent. The majority would be providing more capital with no opportunity for a greater share of the profits with

the plaintiffs continuing to hold 32 percent of the stock. In addition, the corporation already had an inordinate debt-equity ratio,—$320,000 stockholder debt to $1,000 capital,—320-1. This was unhealthy both for the corporation and the stockholder-debtors.

In my opinion the evidence is that in October, 1962, C & C needed additional capital and the issuance of additional stock was the most feasible method to obtain it.

The primary thrust of the majority opinion is that the manner in which the majority carried out its ostensible purpose as it related to plaintiffs and their failure to follow through with their ostensible purpose is convincing evidence that their real motive was to freeze out plaintiffs.

The only notice of pre-emptive rights in evidence is that sent Browning. It reads as follows:

"THIS IS TO CERTIFY that GLEN E. BROWNING is entitled to subscribe for 151,696 shares of the capital stock of C & C Plywood Corp. * * * upon surrender of this certificate * * * on or before January 17, 1963. Payment for the subscription to be One Dollar ($1.00) per share in cash. * * *. Unless the certificate is surrendered at the said office of the Secretary-Treasurer on or before January 17, 1963, accompanied by payment in full, the rights will be void and this certificate of no value or effect.

"DATED this 14th day of December, 1962."

The majority states that it is questionable whether this notice requires Browning to pay for the entire amount of shares to which he was entitled and does not grant him the right to acquire any lesser amount. In my opinion the most reasonable interpretation of

the document is that it granted Browning the right to subscribe for any amount up to 151,696 shares; however, he would have to pay in full by the due date for whatever number of shares he subscribed. This is the interpretation placed upon the notice by the corporation. The minutes state: "The secretary reported that pursuant to the action of the stockholders and of the Directors, stock allotment certificates had been forwarded to each of the stockholders of record to enable them to purchase *up to* their proportionate share of the newly authorized capital stock of the corporation." (Emphasis added.)

In my opinion, once a shareholder has been offered his pre-emptive rights to purchase shares and has not accepted such offer, he has no cause to complain about other stockholders purchasing amounts of the unsubscribed stock for the same price at which it was offered to all the stockholders.

Payment for the additional stock by cancelling or offsetting an existing indebtedness of the purchasing stockholder is also not a prohibited practice.

Both practices were approved in *Bellows v. Porter,* supra (201 F2d at 433). The court stated the facts as follows:

"* * * When the new stock was issued plaintiff was offered the opportunity of purchasing a one-third of it, which was his derivative right. This he declined to do and Porter [the majority stockholder] purchased the entire block of stock and in payment released the corporation's indebtedness to him of $100,000. * * *"

The contention was also made that plaintiff was not financially situated to exercise his pre-emptive rights, which fact was known to the majority stockholder.

The court affirmed the action of the trial court in directing a verdict in favor of Porter, the majority stockholder.

In *Fuller v. Krogh,* 15 Wis2d 412, 113 NW2d 25, 32-34 (1962), a minority stockholders' suit, the court approved the action of a majority stockholder who paid for newly-issued stock by accepting it as payment of a pre-existing debt.

The decision in *Coleman v. La Salle Creosoting Company,* 129 S2d 311 (La App 1961), illustrates the accepted policy of judicial restraint in interfering in corporate affairs even though the evidence of a "squeeze-out" was greater than in the present case.

In that case Coleman had an idea to build a creosoting plant. He needed funds; therefore, the corporation was formed with Coleman subscribing to 40 shares, Cobbs, the financier, to 40 shares, and Bell to 20 shares. Cobbs repeatedly loaned money to the corporation. After about three years Cobbs asked Coleman and Bell to surrender their stock to him to assist in financing the company. He said he could no longer obtain personal loans. They refused to do so. A stockholders meeting was called and all attended. It was unanimously voted that the stockholders would pay for all the stock for which they had subscribed, 150 more shares were authorized, and notice of pre-emptive rights given. The rights were to be exercised and the stock paid for within seven days. About 20 days later another meeting was called; however, Coleman was not notified of the meeting. At that meeting Cobbs paid for the shares for which he had initially subscribed but had not paid, and also paid for his proportionate share of the new issuance, 60 shares. Coleman had not paid for the shares for which he had initially subscribed nor had be exercised his pre-emptive rights

for the new shares. Therefore, at this same meeting Mrs. Cobbs was authorized to purchase Coleman's unpaid for and unsubscribed shares. Both Mr. and Mrs. Cobbs' shares were paid for by crediting the amount owed therefor on the corporation's indebtedness to Cobbs.

The court reversed the trial court's order putting the corporation into receivership. The appellate court did not pass upon the validity of all of Cobbs' actions and primarily based its holding upon the ground that a receivership was not necessary. However, the court stated:

> "* * * Upon proper notice to interested parties (stockholders) a Board of Directors may pass a resolution to the effect that subscriptions to shares of stock must be taken up and may authorize the issuance of shares of stock on a pro-rata basis amongst the stockholders; and upon failure of any shareowner to exercise his right to purchase these shares of stock within the time allotted under the Articles of Incorporation, or the by-laws, the Board of Directors may then authorize that the shares of stock be issued to other shareholders and/or others. And, in doing so a shareholder may very well be placed in the position that Coleman is at present. In that case, nothing is illegal and the shareowners have nothing to complain about." 129 S2d at 319.

The majority is of the opinion that the ultimate discrimination took place at the February 11, 1963, meeting at which the majority stockholders were authorized to buy stock by crediting the cost thereof against their debt and Thomason was authorized to buy stock and subsequently paid therefor and in about the same amount that he received about the same time in payment of a wage claim. The majority states

that Browning was not given "the opportunity thus afforded the other stockholders."

As I interpret the notice of pre-emptive rights, Browning was given the opportunity to purchase as many shares of stock as he wanted up to 151,696 shares, if he could pay for them. He did not purchase any and the majority states, and it appears uncontradicted, that he had no funds to purchase any "appreciable part." There is no evidence he had any more funds in February than he did in January when he did not exercise his pre-emptive rights. Apparently, the majority is referring to the opportunity given to the majority stockholders to pay for their additional shares by a credit on their debt and by Thomason cashing in his wage claim. Browning had not lent the corporation any money; therefore, he could not credit any indebtedness as the majority did. Browning had a wage claim, as did Thomason, but his claim was contested by the corporation. In October, 1962, his claim was in the hands of his attorney and either already in litigation or about to be. Browning never sought to pay for stock with his contested wage claim. The majority said it had some value. I think that is only an inference, but even if it had, I doubt if Browning was discriminated against because the corporation would not sell him stock for a disputed wage claim.

Browning's actual complaint is a most common one. He did not have any money or its equivalent to protect his interest. This is always unfortunate, but not a ground for judicial relief.

In my opinion the most favorable evidence for the plaintiff is that the majority did not accomplish what it said it was going to by issuing additional stock. It did not secure additional capital for the company.

However, I find a plausible business explanation for the subsequent conduct of the majority.

The July, 1962, financial statement, the only relevant statement in evidence, shows a cumulative deficit of $200,000. In October, 1962, when the additional stock was issued, the company needed additional capital, and its financial future was uncertain. In February, 1963, when the defendant stockholders purchased additional stock, there was a "betterment in this company's financial condition." The yearly statement made as of July, 1963, shows a net operational income for the year of $224,000, with no deficit, but, rather, retained earnings of $22,000.

When the majority stockholders purchased some of the newly-issued stock in February, 1963, the need for any substantial amount of long-term additional capital had greatly diminished. In March, 1963, the corporation started repaying the trustees for the loans previously made. A total of $70,000 was repaid to the trustees from March, 1963, to December 31, 1963.

By February, 1963, the corporate picture was bright enough to make the stock, at the authorized price of $1.00 per share, much too valuable for sale to the public and a fine investment for the trustees. On the basis of the original 1,000 shares, and including depreciation, plaintiff claims C & C's earnings for the year ending July, 1963, were $350 per share.

The minutes of the directors meeting at which the sale to the trustees was authorized state: "He [the secretary and defendant Riddlesbarger] then stated on behalf of himself as Trustee for Patricia Jordan and Marjorie Pratt, respectively, that * * * the Trustees should have the opportunity to participate to a greater extent in the profits of the corporation should

such profits ever materialize. He urged that the Trustees be given the opportunity to exchange overdue notes for shares of stock of the corporation on the basis of $1 per share for said stock."

Another express purpose for the authorization of additional stock was to correct the debt-equity ratio. In my opinion this was largely accomplished although conservative financing practice might have reduced the proportion even more. The ratio had been 320 debt to 1 equity. With the purchase of $31,000 additional stock the ratio became a respectable 10-1. For income tax purposes a 4 to 1 ratio was at one time believed to be the highest safe ratio. Schlesinger, *Acceptable Capital Structures: How Thin Is Too Thin?*, 5 Fla L Rev 355, 377 (1952). However, by 1963 courts had held amounts advanced as loans were, in fact, loans, although the ratio of loan to capital contribution was substantially higher than even 10 to 1. The intention of the parties was relied upon as being more significant than the ratio of debt to capital. Gerver, *De-emphasis of Debt-equity Test For Thin Corporations Requires New Defense Tactics*, 23 J Taxation 28 (1965).

All of these are plausible, legitimate business reasons for not following through, or for only following through in part, in 1963, to attain the goals set in October, 1962.

Admittedly, the evidence could support the inference that the defendants' conduct was motivated solely by a desire to "freeze out" the plantiffs. However, my reaction to the evidence is that such an inference is not a compelling one. The two trustee defendants, an attorney and an accountant, testified unequivocally that the stock issue or the ensuing conduct was not for

the purpose of "defeating or reducing in any way the interest of either Browning or Randolph."

The trial court made no specific findings; however, it found for the defendants and if it applied the correct law, as it presumably did, it must necessarily have found that defendants' prime motive was not to "freeze out" plaintiffs.

I would affirm the decision of the trial court.