Argued February 6, affirmed March 1, 1973

BAKER ET UX, *Appellants, v.* COMMERCIAL
BODY BUILDERS, INC. ET AL, *Respondents.*

507 P2d 387

*Richard H. Muller,* Portland, argued the cause for appellants. With him on the briefs were Bouneff, Muller, Marshall & Hawkes, Portland.

*Allen L. Fallgren,* Portland, argued the cause and filed the brief for respondents.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, TONGUE, HOWELL and BRYSON, Justices.

TONGUE, J.

This is a suit under ORS 57.595 by the owners of 49% of the stock in a "close corporation" to compel a dissolution of the corporation for alleged "illegal, oppressive and fraudulent" conduct by defendants Siler as directors of the corporation and for "misapplication and waste" of its assets.[1]

Plaintiffs appeal from a decree dismissing their

---

[1] ORS 57.595 provides, in part, as follows:

"(1) The circuit courts shall have full power to liquidate the assets and business of a corporation:

"(a) In an action by a shareholder when it is established:
"\* \* \* \* \*
"(B) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or
"\* \* \* \* \*
"(D) That the corporate assets are being misapplied or wasted."

ORS 57.600 provides, in part, as follows:

"(1) In proceedings to liquidate the assets and business of a corporation the court shall have power to issue injunctions, to appoint a receiver or receivers pendente lite, with such powers and duties as the court, from time to time, may direct, and to take such other proceedings as may be requisite to preserve the corporate assets wherever situated, and carry on the business of the corporation until a full hearing can be had."

complaint, based on findings by the trial court that "[p]laintiffs have not established by the required quantum of evidence, that any acts of the defendants Siler, as directors, have been or now are illegal, oppressive or fraudulent" or "any showing of circumstances which would justify the equitable relief prayed for." We affirm.

On trial, according to the record of proceedings in the trial court, the case was submitted for decision upon the issue of whether or not the corporation should be liquidated or whether, as an alternative, plaintiffs were entitled to entry of a judgment in the amount of $36,504.07, representing the book value of their stock so as to require, in effect, the purchase of their stock by defendants at that price. On this appeal, however, plaintiffs contend that either "the remedies called for in ORS 57.595 and ORS 57.600 should be decreed by this Court or the case should be returned to the court below for the fashioning of an appropriate remedy under its equitable powers to restore the status quo or require the Silers to do equity."[2]

It thus becomes necessary to review the evi-

---

[2] The prayer of plaintiffs' complaint was as follows:

"1. To require Defendant Corporation and/or Defendants Siler to provide a copy of the corporate By-Laws to Plaintiffs.

"2. To liquidate the Corporation and distribute the assets, pro rata to the shareholders thereof.

"3. To appoint a receiver pendente lite * * *.

"4. To require a full accounting from Defendants Siler as to the application of corporate funds since September 22, 1967.

"5. To award Plaintiffs a reasonable attorney's fees and their plus costs and disbursements incurred herein.

"6. For such other and further relief as to the Court seems just and meet.

"7. To enjoin the defendant, Siler, from engaging in a competing business."

dence. Because of the manner in which the case was tried and the somewhat vague nature of some of the testimony it is difficult to reconstruct the facts, particularly in a chronological order.

1. *Summary of evidence.*

    a. *Organization of corporation. Subsequent purchase of stock by Baker. Original agreement between parties.*

Defendant Commercial Body Builders, Inc., ("Commercial") was originally organized in August 1966 by defendants Charles Siler and his wife as a family corporation. Its purpose was to engage in the construction of truck bodies, lift gates, and related truck equipment—a business with which Siler was thoroughly familiar and experienced.

About a year later, in 1967, at the suggestion of defendant Siler, plaintiff Baker invested $14,210 in the corporation. Baker was not familiar with the business, but was engaged in the insurance and real estate business. At that time an additional 100 shares of stock were issued and Baker and his wife became owners of 98 shares of the corporation's stock, while Siler and his wife retained ownership of 102 shares.[9] Baker also signed a promissory note for $5,000, payable to Siler, with no time specified for payment, but with payment to be made from the "proceeds" of

---

[9] According to "Statements of Financial Condition" the capital stock of the corporation at the end of its first fiscal year on June 30, 1967, was $23,500, and as of June 30, 1968, was $29.000, not including retained earnings of $9,743.90 as the result of profits during that year. It does not appear how the payment by Baker was treated in determining the capital stock for the purposes of such statements.

future bonuses to be paid to employees, including Baker.[④]

At the same time, Siler was elected president and his wife treasurer of the corporation, while Baker was elected vice-president and his wife secretary. Monthly salaries were also established, including a salary of $800 to Siler, $200 to his wife, and $100 to Baker. Siler, however, spent full time in the business and his wife worked approximately six hours each business day as bookkeeper, while it was agreed that Baker would spend one day each week at the office. At that time, however, he apparently devoted at least part of that day to the transaction of his insurance and real estate business. As stated by Baker, there was no "formal understanding" what he was to do for Commercial, but the monthly salary of $100 was used by him to pay off the mortgage loan by which he raised the money to purchase the stock.

Shortly afterwards, a "buy-sell" agreement was prepared by Baker's attorney and was signed by the parties. By its terms, if either party desired to sell his stock he was required to first offer it to the other party "at the same price as offered on the market or at the book value of said shares as computed by the accounting methods regularly recognized for the computation of book value of corporate stock, whichever is less."

b. *Two profitable years of operation. Increase in salaries and bonuses.*

At the end of the following fiscal year on June 30,

---

[④] The reason for this note, according to Siler, was that because he and his wife had started the business he was not willing to let Baker come in on the basis under which he would "match dollar for dollar" what Siler and his wife had "put in."

1968, the corporation showed a profit of $9,743.90. At that time the following bonuses were paid: Siler, $1,750; Baker, $1,000, and Mrs. Siler, $500. As of the same date salaries were increased as follows: Siler to $1,000 per month, his wife to $350 per month, and Baker to $250 per month.

Similarly, at the end of the next fiscal year on June 30, 1969, the corporation showed a further profit of $19,712.16. According to Siler, however, as of that date Baker, although "doing a satisfactory job," was not making any contacts or sales. Nevertheless, the following additional bonuses were then paid: Siler, $2,625; Baker, $1,500, and Mrs. Siler, $750. On October 6, 1969, Siler's salary was also increased to $1,500, as of July 1, 1969, with no corresponding increase to Baker or to Mrs. Siler. To provide for future expansion, the corporation also loaned $1,370.58 each to Siler and to Baker to provide funds for use as a down payment for the purchase of adjacent property. That property was then apparently purchased by them as partners, under the name of Dorpat Investment Co., and was leased to the corporation.

c. *Termination of Baker and negotiations for purchase of his stock.*

During the fiscal year 1969-1970, according to Siler, business was "terrible" and although sales increased by $50,000, labor costs increased even more. During that same year, as a result of the organization of Dorpat and the leasing of larger quarters from it, payments for rent, insurance, taxes, "moving in" expenses, and other items were increased. The profit for the fiscal year ending June 30, 1970, dropped to $269.52.

Also, according to both Siler and Baker, the re-lationship between them deteriorated in early 1970. Siler testified that Baker made only one small sale while he was with the company and that he was not "getting out and calling on the trade" or spending as much time as he should for the company.[6] Baker testi-fied, however, that Siler told him not to contact large companies, such as the telephone company, because any resulting orders would be too large for the small business to handle and that relations deteriorated be-cause Siler wanted him to sell out and because Siler thought that a Mr. Ahern could do more for the bus-iness than Baker could.

In early May 1970, Mr. Ahern tried to talk to Baker about purchasing his stock, but Baker refused to talk to him about a price for the sale of his stock. According to Baker, he was then offered $20,000 for his stock by Siler, who "intimated" that if Baker didn't sell he would get no profits from the business.

Siler denied that statement and denied making an offer to Baker for his stock, but said that Ahern also wanted to buy Siler's stock and had offered to pay $45,000 for it, because 51% was worth much more than 49%, and that Siler told Baker that if he sold out the purchaser might operate the business in such a way that it would show no profits. Siler also testified that he told Baker, apparently on another occasion, that Ahern would pay Baker $22,500 for his stock; that he talked to Baker about that offer; that Baker said he

---

[6] Siler also testified that he was upset at Baker because Baker twice purchased new sets of tires for the company car which he rented from the company, at a somewhat nominal rental, and that he paid more for the tires than Siler could get them for and charged them to the corporation, contrary to instructions that such purchases were to be "cleared" through Siler.

didn't know what to do, and that he told Baker that if Baker didn't sell to Ahern, Siler was going to do so. In addition, Siler testified that he tried to get Baker to buy him out, but that Baker would not do so and would not tell Ahern whether or not he would sell out to him.

On June 25, 1970, after these negotiations failed, Baker was terminated as a salesman "because of unsatisfactory work performance." According to Siler, this was done because Baker had made no sales and because Siler decided that Baker "was not doing the company any good." On July 10, 1970, Baker and his wife were "voted out" as directors and officers. After that date no notices were sent to Baker of any further stockholders' meetings and he was not consulted by Siler thereafter about the business. Baker also testified that he was also not permitted to see the company books and that he had to get "legal redress" in order to do so. This was denied by Siler.

Also, at the meeting on July 10, 1970, Siler's salary was increased to $1,800 per month and his wife's salary was increased to $500. There were no subsequent salary increases and no bonuses were paid to Siler or to his wife, however, either at the end of the 1969-70 fiscal year or at any later date.[6]

During the period of the years from 1967 to 1970, prior to Baker's "termination," he was paid

---

[6] Payment of a salary to Siler of $1,800 per month had previously been recommended by the CPA engaged by the company at the time when Siler's salary was increased to $1,500. In addition, Siler justified these salary increases by the savings resulting from the elimination of Baker's salary and automobile expenses. Siler and his wife continued, as in the past, to use a company owned pickup truck and car. Baker also complained that Siler employed his own son. Siler, however, justified this by saying that he paid his son less than previously paid to the employee who was replaced by his son.

$7,975 in salary for his services for one day each week, plus $2,500 in bonuses, for a total of $10,475, not including the value of medical insurance and the use of a company car at a somewhat nominal rental. As previously stated, he was offered $22,500 for the stock, for which he had paid $14,210. As also previously noted, Baker also had given Siler a $5,000 note payable from the "proceeds" of the corporation, on which he subsequently paid $1,000 to Siler.

    d. *Funds and services provided by corporation to Advance Hydro Wreckers, Mfg., Inc.*

In late 1970, a new corporation was organized named Advance Hydro Wreckers, Mfg., Inc. ("Hydro"). Siler was its president and was issued 30% of its stock, in return for his "ability to set the operation in motion." The remaining stock was apparently issued to Ahern, who was "to furnish the money," and to a man named Mr. Nowell, who claimed to own patents for certain wrecker equipment.

According to Siler, this corporation was organized because Commercial could not otherwise build such equipment in view of these patents. Siler did not consult Baker about the Hydro venture.

Hydro leased a portion of Commercial's unused shop space and also used Commercial's office. Prior to December 1, 1970 (when Hydro apparently acquired its own crew), the Commercial crew did work for Hydro. Commercial also furnished bookkeeping services to Hydro. As of May 1971, Hydro owed $10,700 to Commercial. Nevertheless, the Commercial financial statements for the fiscal year ending June 30, 1971, as prepared by a CPA, show a net profit of $15,772.53 and a net worth in the sum of $74,498.11, after including that profit as "retained earnings."

Hydro apparently ceased active operations after a few months and Commercial advanced $2,510 to pay a debt owed by Hydro for the purchase of a wrecker chassis. Commercial also billed $6,700 to Hydro for labor made available by the Commercial crew to build the wrecker on that chassis, which Commercial then took over in payment for these advances and was holding for sale at the time of trial. Commercial also billed Hydro for $1,500 for bookkeeping and managerial services. Hydro was also delinquent in some rental payments and at the time of trial owed a balance of approximately $5,000 to Commercial.

Although the Commercial accounts receivable increased substantially after the advent of Hydro and apparently included substantial amounts owed by Hydro, at least at one time, and although, as a result, Commercial had to borrow $7,000, and was Hydro's largest creditor, there was no direct proof that, as a result, Commercial had suffered any actual loss as of the time of trial in January 1972. As of that date it appears that Hydro had ceased active operations and that Commercial had ceased making any further "advances" to it. It also appears that Hydro then still owned some completed "wreckers," which it had for sale. In addition, Siler was apparently negotiating with Nowell to take over the assets of Hydro, including the alleged patent rights, for enough money to pay the balance owed by Hydro to Commercial.

Neither was there evidence whether Commercial made a profit or suffered a loss during the period between the end of the fiscal year on June 30, 1971, and at the time of trial in January 1972. According to Siler, Hydro did not compete with Commercial and the Commercial crew worked for Hydro during "slack

periods," so as to keep the crew busy, rather than lay off men and risk losing them. Also, Baker testified on trial that he presumed that the last financial statements, which were prepared by a CPA and showed a net worth of $74,498, were accurate and that the corporation was worth more at the time of trial than when he was "terminated" in June 1970.

Indeed, at the conclusion of the trial plaintiffs' attorney stated that his "calculation [based upon that same amount] is that at the present time the book value of 49% is worth $36,504.07" and that was the amount for which plaintiffs demanded judgment in the trial court as the "value of their stock," and as an alternative to a forced dissolution of the corporation.

2. *Plaintiffs' contentions—Browning v. C & C Plywood Corp.*

Plaintiffs' primary contentions are: (1) that the trial court erred when it failed to find that the conduct of defendants Siler was "oppressive" within the meaning of ORS 57.595, as construed by this court in *Browning v. C & C Plywood Corp.*, 248 Or 574, 434 P2d 339 (1967), and (2) that the trial court should have used its equitable powers to provide a remedy even if it felt that those provided in ORS 57.595 and 57.600 were inappropriate.

Plaintiffs say that this court formerly subscribed to the "robber baron" theory of corporation law to the effect that the majority stockholders who control the operation of a corporation can do "anything," including a "squeeze out" of minority stockholders, so long as they break no specific laws and commit no actual fraud and that they owe no fiduciary duty to minority stockholders, citing *McMunn v. M L & H*

*Lumber,* 247 Or 319, 429 P2d 798 (1967), and *Jackson v. Nicolai-Neppach Co.,* 219 Or 560, 348 P2d 9 (1959), as our most recent decisions "reiterating the old 'robber baron' theory."

Plaintiffs also say that in *Browning v. C & C Plywood Corp., supra,* this court "modified" that "line of cases in Oregon" and "adopted the modern rule expressed in O'Neal," citing 2 O'Neal, Close Corporations (1971 ed) 43-45, § 8.07, to the effect that court decisions are "outmoded" which allow a "squeeze out" or "freeze out," including one accomplished by the following "form of conduct":

> " '* * * The shareholder, director, officers refuse to declare dividends but provide high compensation for themselves and otherwise enjoy to the fullest the "patronage" which corporate control entails, leaving minority shareholders who do not hold corporate office with the choice of getting little or no return on their investments for an indefinite period of time or selling out to the majority shareholders at whatever price they will offer * * *.' "

In *Browning* the "squeeze out" was accomplished by what is recognized in O'Neal, *supra* (at 43), as an entirely different "form of conduct." Thus, in that case the majority increased the amount of corporate stock, with pre-emptive rights to existing stockholders to participate in the purchase of such stock in an amount proportionate to the percentage of their previous stock ownership in the corporation. This court found, however, that this was done with knowledge that plaintiff, who then owned a 32% stock interest, would be financially unable to purchase that percentage of the newly issued stock and was done with the purpose of eliminating his interest in the

corporation and in such a manner as to reduce that interest from 32% to 1%.

Although the majority opinion in *Browning* (at p 581) cited O'Neal, *supra,* as providing "the best analysis of the few cases that are relevant to the question at hand," it did not embrace the proposals by O'Neal to the extent implied by the plaintiffs in this case. Indeed, the only further reference to O'Neal was as follows (at p 581):

> "* * * [t]he authors examine the reluctance of the courts to interfere in intra-corporate disputes but also find that courts have given relief when the purpose of the increased stock issue is only for the benefit of the majority and serves no corporate purpose. * * *"

It is true that in *Browning* this court, instead of decreeing a dissolution of the corporation, remanded the case to the trial court with instructions to determine the feasibility of alternative relief under which plaintiff would be permitted to purchase additional stock in an amount sufficient to retain his 32% interest, to be paid for, in part, by credit for unpaid salary or by an award of damages.

■ In so holding, however, this court in *Browning* neither cited nor overruled previous decisions, such as *Jackson v. Nicolai-Neppach Co., supra* (at pp 574, 575 and 585), in which the court, after reviewing the history of ORS 57.595, rejected the view that "would permit dissolution whenever the jurisdictional facts are proven"[2] and held (at p 587) that in a suit under ORS 57.595 (as in this case) the court is not required

[2] The court, in Jackson v. Nicolai-Neppach Co., 219 Or 560, 348 P2d 9 (1959) (at p 585), cited Israels, The Sacred Cow of Corporate Existence—Problems of Deadlock and Dissolution, 19 U Chi L Rev 778 (1952), as representing a statement of that view.

to dissolve a corporation upon proof of a deadlock between its stockholders, as in *Jackson,* but that in such a suit the court may consider the equities of the individual case, recognizing that dissolution is a harsh remedy, and that in such cases courts of equity retain the discretion whether to grant or refuse equitable relief. Thus, our opinion in *Jackson* said (at p 575) that:

> "* * * [a]s we read the statute its intent is to obligate the courts to thread their way from case to case without the assistance of sweeping generalizations."

We still subscribe to these views. In doing so, however, we do not mean to approve what plaintiff refers to as the "robber baron" theory of corporate operation, much less to give approval to "squeeze out" or "freeze out" tactics in "close" corporations.

3. *What is "oppressive" conduct for the purposes of ORS 57.595.*

■ In considering the meaning and application of the term "oppressive" conduct it is first to be noted that by the very terms of ORS 57.595 conduct need not be fraudulent or illegal to be "oppressive" within the meaning of that statute.[9]

While general definitions of "oppressive" conduct are of little value for application in a specific case, perhaps the most widely quoted definitions are that "oppressive conduct" for the purposes of such a statute is:

> " 'burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members;

---

[9] ORS 57.595 (1)(a)(B) authorizes dissolution for "illegal, oppressive or fraudulent" conduct.

' . or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.' "[36]

. We agree, however, that the question of what is "oppressive" conduct by those in control of a "close" corporation as its majority stockholders is closely related to what we agree to be the fiduciary duty of a good faith and fair dealing owed by them to its minority stockholders.[37]

Thus, an abuse of corporate position for private gain at the expense of the stockholders is "oppressive" conduct.[38] Or the plundering of a "close" corporation by the siphoning off of profits by excessive salaries or bonus payments and the operation of the business for the sole benefit of the majority of the stockholders, to the detriment of the minority stockholders, would constitute such "oppressive" conduct as to authorize a dissolution of the corporation under the terms of ORS 57.595.[39]

---

[36] Comment, 1965 Duke LJ 128, 134, quoting from Scottish Co-op. Wholesale Soc'y, Ltd. v. Meyer, [1958] 3 All ER 66, 71, 86 (HL) and Elder v. Elder & Watson, Ltd., [1952] Sess Cas 49, 55. Both of these cases involve construction of an English statute which is similar to ORS 57.595, and authorizes dissolution if "the affairs of the company are being conducted in a manner oppressive to some part of the members." The [British] Companies Act of 1948, 11 & 12 Geo 6, c 38, § 210.

[37] See O'Neal and Derwin, Expulsion or Oppression of Business Associates 194-95, § 8.02 (1961); Tingle, The Shareholder's Remedy of Corporate Dissolution 37 (1959); 13 Fletcher Cyclopedia Corporations (rev vol 1970) 105, § 5810; Note, 74 Harv L Rev 1630, 1636 (1961); Comment, 1959 Duke LJ 122, 123; Comment, 1965 Duke LJ 128, 133; and Note, 56 Va L Rev 271, 278-79 (1970).

[38] Hornstein, A Remedy for Corporate Abuse, 40 Col L Rev 220, 235 (1940); Comment, 1965 Duke LJ 128, 131.

[39] Id. and O'Neal, Oppognancy and Oppression in Close Corporations, 1 BC Ind and Com L Rev 1, 3 (1959).

On the other hand, it has been said that a single act in breach of such a fiduciary duty may not constitute such "oppressive" conduct as to authorize the dissolution of a corporation unless extremely serious in nature[13] and that even a continuing course of "oppressive" conduct may not be sufficient for that purpose unless it appears that, as a result, there has been a disproportionate loss to the minority[14] or that those in control of the corporation are so incorrigible that they can no longer be trusted to manage it fairly in the interests of its stockholders.[15]

■ ■ In other words, although a showing of "imminent disaster" is not required, liquidation is not available upon a showing of mere vague apprehensions of possible future mischief or injury or to extricate minority stockholders from an investment that turns out to be a bad bargain.[16] We also reject the concept that a "close corporation" is like a partnership to the extent that a minority stockholder should have the same right as a partner to demand a dissolution of the business upon substantially the same showing as may be sufficient for the dissolution of a partnership.[17] After all, the remedy of a forced dissolution of a corporation may equally be "oppressive"[18] to the majority stockholders.

[13] Note, 35 Geo Wash L.Rev 1068, 1076 (1967).
[14] Comment, 1965 Duke LJ 128, 136.
[15] Tingle, The Shareholder's Remedy of Corporate Dissolution, 42-43 (1959).
[16] White v. Perkins, 213 Va 129, 189 SE2d 315, 319 (1972); Central Standard Life Insurance Company v. Davis, 10 Ill 2d 566, 141 NE2d 45, 50 (1957); and Tingle, *supra* note 15, at 41-42.
[17] See Jackson v. Nicolai-Neppach Co., 219 Or 560, 585, 348 P2d 9 (1959), in which the court discussed similar proposals as stated in Israels, The Sacred Cow of Corporate Existence, 19 U Chi L Rev 778, 789-791 (1952).
[18] See Jackson v. Nicolai-Neppach Co., *supra* note 17, at 587, and Note, 56 Va L Rev 271, 276-77 (1970).

It has also been said that the decision by a court whether or not to require dissolution of a corporation for "oppressive" conduct requires an "appraisal of the future" of the corporation and that if the future appears to hold "no hope" or if the majority is "incorrigible" dissolution may be an appropriate remedy.[18]

■ In any event, and as previously stated, while a showing of "oppressive" conduct may be sufficient to confer jurisdiction upon the court under ORS 57.595, such a showing does not require the court to exercise the power conferred upon it by that statute to require either the dissolution of a corporation or any other alternative equitable remedy.[19] We thus come to the question of what, if any, other remedies may be appropriate in such a case as an alternative to the forced dissolution of a corporation.

4. *Remedies available for "oppressive" conduct as an alternative to dissolution.*

■ We have already held in *Browning, supra* (at p 582), that in a suit under ORS 57.595 for "oppressive" conduct consisting of a "squeeze out" or "freeze out" in a "close" corporation the courts are not limited to the remedy of dissolution, but may, as an alternative, consider other appropriate equitable relief. Depending upon the facts of the case and the nature of the

[18] See Gidwitz v. Lanzit Corrugated Box Co.; 20 Ill 2d 208, 170 NE2d 131, 138 (1960), and Comment, 1965 Duke LJ 128, 139. See also Bellevue Gardens, Inc. v. Hill, 111 US App DC 343, 297 F2d 185, 187 (DC Cir 1961), and Tingle, *supra* note 15, at 43.

[19] See Jackson v. Nicolai-Neppach Co., *supra* note 17, at 585-86; and Note, 74 Harv L Rev 1461, 1464 (1961). Cf. Comment, 1959 Duke LJ 122, 125, and Hornstein, A Remedy for Corporate Abuse, 40 Col L Rev 220 at 235 (1940).

problem involved, various alternative remedies may be appropriate. Among those suggested are the following:

(a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;[20]

(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all of the stockholders, both majority and minority, until differences are resolved or "oppressive" conduct ceases;[21]

(c) The appointment of a "special fiscal agent" to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;[22]

(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or "special fiscal agent";[23]

(e) The ordering of an accounting by the ma-

---

[20] O'Neal and Derwin, Expulsion or Oppression of Business Associates 211, § 8.09 (1961), citing Tri-City Electric Service Co. v. Jarvis, 206 Ind 5, 185 NE 136 (1933), and Schipper Bros. Coal Min. Co. v. Economy Domestic Coal Co., 277 Pa 356, 121 A 193 (1923). See also Hornstein, A Remedy for Corporate Abuse, 40 Col L Rev 220 at 236-237 (1940).

[21] Comment, 1965 Duke LJ 436, 441; Note, 30 Cinn L Rev 478, 486 (1961).

[22] O'Neal and Derwin, Expulsion or Oppression of Business Associates 214, § 8.09 (1961); Note 41 Ind LJ 256, 283 (1966); and Roach v. Margulies, 42 NJ Super 243, 126 A2d 45, 46 (1956).

[23] O'Neal and Derwin, Expulsion or Oppression of Business Associates 215, § 8.09 (1961); Note 41 Ind LJ 256, 282 (1966); Patton v. Nicholas, 154 Tex 385, 279 SW2d 848 (1955). See also Tingle, supra note 15, at 49-50.

jority in control of the corporation for funds alleged to have been misappropriated;[25]

(f) The issuance of an injunction to prohibit continuing acts of "oppressive" conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;[26]

(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;[27]

(h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;[28]

(i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;[29]

(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of "oppressive" conduct by the majority in control of the corporation.[30]

[25] Note, 1972 Duke LJ 653, 660; Hornstein, A Remedy for Corporate Abuse, 40 Col L Rev 220, at 236 (1940).

[26] See ibid and Comment, 1959 Duke LJ 436, 441. See also Hornstein, A Remedy for Corporate Abuse, 40 Col L Rev 220, 236 (1940).

[27] See also Tingle, supra note 15, at 49, citing Patton v. Nicholas, 154 Tex 385, 279 SW2d 848 (1955); Comment, 1959 Duke LJ 436, 441.

[28] Comment, 5 Will LJ 639, 658 (1969); Hornstein, A Remedy for Corporate Abuse, 40 Col L Rev 220 at 238 (1940).

[29] Browning v. C & C Plywood Corp., 248 Or 574, 587, 434 P2d 339 (1967). This remedy has sometimes been provided by statute. Tingle, supra note 15, at 59, citing Cal Corp Code §§ 4658–4659.

[30] Browning v. C & C Plywood Corp., 248 Or 574, 587, 434 P2d 339 (1967).

### 5. *Analysis of plaintiffs' charges of "specific acts of wrongdoing."*

As "specific acts of wrongdoing" upon which plaintiffs rely in support of its contention that Silers' conduct amount to "oppressive" conduct, plaintiffs list the following:

> "Defendants continued to pay themselves ever increasing salaries and fringe benefits while excluding the Bakers from corporate participation. They have paid money to a debtor corporation in which they own a 1/3 interest during the time that corporation owes Defendant corporation money. They have permitted the other corporation, Advanced Hydro Wreckers, to compete with the Defendant corporation and to use the facilities of the defendant corporation without just compensation * * *. Although the business is still profitable, Defendants have siphoned all profits off into their own pockets and have excluded the Plaintiffs from any corporate benefits and have openly and flagrantly applied the "squeeze out—freeze out". Defendants have failed to notify the Plaintiffs of corporate meetings on occasion and have falsified the records concerning those meetings. They have at all times treated the corporation as if it were the Silers' private property with which they can do as they see fit, to the exclusion of the Bakers."

Before undertaking to reach any conclusions whether the foregoing charges constitute "oppressive" conduct within the meaning of ORS 57.595 so serious as to require the intervention of a court of equity and, if so, what would be an appropriate remedy, reference should also be made to the following facts as they appear from the record in this case:

(a) It is true that Siler and his wife excluded Baker and his wife from "corporate participation." It must be remembered, however, that Siler had started

the business before Baker came in; that Siler was probably the only one with the knowledge and experience required for the successful operation, and that his wife had also worked some six hours per day, five days a week, as bookkeeper for the business, whereas it appears that Baker only purported to spend one day per week with the business and apparently contributed little, if anything, to its successful operation other than his monetary investment. Accordingly, while he could not be properly excluded from "corporate participation" as a stockholder, it is an entirely different question whether it was "oppressive" to terminate his salary as an employee, together with his use of a company car and his medical insurance as an employee, despite the fact that Siler and his wife retained such benefits as full time employees of the corporation.

(b) While this would not justify the Silers in "siphoning all profits into their own pocket" by the payment of "ever increasing salaries and fringe benefits," to the detriment of plaintiffs, as stockholders, the evidence in this case does not support that charge. During the two-year period of Baker's active "participation," Siler's monthly salary had been increased from $800 to $1,500 and his wife's salary from $200 to $350. In addition, Siler was paid bonuses of $1,750 and $2,625 and his wife received $500 and $750 in bonuses. During the period after Baker's termination on May 31, 1970, and continuing to the date of trial in January 1972, no further bonuses were paid, although Siler's salary was increased from $1,500 to $1,800 and his wife's salary from $350 to $500 per month. There was no evidence, however, that such salaries were excessive, whether on a comparative basis, considering salaries paid to others in the same business for similar

work, or on any other objective basis.[38] In addition, the financial statement for the year ending June 30, 1971, as prepared by a CPA and conceded by plaintiffs to be accurate, showed a profit of $15,772.53 during that period. Plaintiffs also concede that the net worth of the business at the time of trial was at least as much as on that date.

(c) It is also true that the Bakers, as stockholders, had a legitimate interest in the participation in profits earned by the corporation. Plaintiffs do not, however, request the court in this proceeding to require the declaration of a dividend so as to distribute profits improperly withheld by the corporation. The question whether profits must be distributed as dividends, rather than "plowed back" into a business, is by no means a simple problem. No attempt was made by plaintiffs to litigate that problem on the trial of this case and it is one that is normally litigated by a stockholder's derivative suit, rather than in a suit of this kind.[39]

(d) It may have been improvident for Siler to advance corporate funds to Hydro, in which he owned an interest. However, there was no evidence that Hydro's production of "wreckers," for which it apparently held some patents, improperly "competed" with Commercial or that Hydro was not charged "just compensation" for using corporate "facilities." It appears, however, that defendants have provided plaintiffs with the accounting demanded by them and that there is no evidence that as a result of any such conduct

·· [38] See Comment, 1959 Duke LJ 436, 440 and O'Neal, Oppugnancy and Oppression in Close Corporations, 1 BC Ind & Com L Rev 1, 17 (1959).

[39] See 13 Fletcher Cyclopedia Corporations (rev vol 1970) 307, § 5923.1.

the corporation suffered financial loss in any ascertainable amount. On the contrary, the corporation apparently made a substantial profit during that same year. Moreover, the Hydro venture is now being liquidated and there was no evidence to indicate that it may be revived in the future.

(e) It was highly improper for defendants to prevent plaintiffs from examining the corporate records, to fail to notify plaintiffs of certain corporate meetings and to "falsify" records of such meetings so as to indicate that plaintiffs had been notified or were present. It appears, however, that plaintiffs have since been permitted to examine the records and that the meetings in question occurred in 1969 and 1970. There was also no evidence that there is any reason to believe that proper notice will not be given to them of future meetings.

(f) In evaluating plaintiffs' further charge that defendants' conduct has not only been "inequitable," but "will result in a severe financial loss" to plaintiffs, it must also be remembered that plaintiffs were offered $22,500 for their stock and that they apparently were not interested in any sale of their stock at that time. It is true this was less than what plaintiffs considered to be its book value of $36,504.07, which they demanded on trial as an alternative to a forced corporate dissolution. On the other hand, it is common knowledge that, as a practical matter, the stock acquired by one who purchases a 49% interest in a "close" family corporation, as in this case, is worth considerably less than 49% of the book value of such stock. Furthermore, considering the expenses of a receiver, as well as other expenses incurred in dissolution proceedings, as well as the fact that on such a dissolution the value of the

assets of the corporation as a going concern might be destroyed, the result of a forced dissolution, as originally demanded by plaintiffs, might well result in a return to the stockholders, including plaintiffs, of considerably less than the book value of their stock.

7.  Upon considering plaintiffs' charges of "specific acts of wrongdoing," in the light of the foregoing additional facts, we conclude that although some of the conduct of defendants Siler in 1970 was "oppressive" conduct within the meaning of ORS 57.595, we cannot say that the trial judge, who heard the witnesses and observed their demeanor, was in error in finding, in effect, that such conduct was not so serious as to require the relief prayed for by plaintiffs in this case and after examination of the entire record we agree with his finding to that effect.  For the same reasons, we also conclude that none of the alternative equitable remedies listed above would be appropriate in this case. In that connection, it should again be noted that most of the conduct complained of by plaintiffs occurred in 1970 and did not continue after that year.

Affirmed, without costs to either party.