Argued and submitted September 6, 2013, judgment reversed in part and remanded on appeal and cross-appeal February 25, petition for review denied June 18, 2015 (357 Or 415)

Denis HICKEY,
on behalf of himself and all other
shareholders of Hickey Ranches, Inc.,
an Oregon corporation,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

Andrew J. HICKEY;
and H & H Cattle Feeders, Inc.,
an Oregon corporation,
*Defendants-Appellants*
*Cross-Respondents,*

*and*

HICKEY RANCHES, INC.,
an Oregon corporation,
*Defendant-Respondent,*

*and*

John DOES 1-10,
*Defendants.*

Klamath County Circuit Court
0704386CV; A147789

344 P3d 512

Bruce C. Moore argued the cause and filed the briefs for appellants-cross-respondents.

Eric B. Mitton argued the cause for respondent-cross-appellant Denis Hickey. With him on the briefs was Hornecker, Cowling, Hassen & Heysell, L.L.P.

No appearance for respondent Hickey Ranches, Inc.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Andrew Hickey (Andy) and H & H Cattle Feeders, Inc. (H & H) appeal a general judgment, challenging two remedies ordered by the trial court under ORS 60.952 upon its finding that Andy had engaged in self-dealing between Hickey Ranches, Inc. (HRI), a closely held family corporation, and H & H, a company that Andy wholly owned.[1] Denis Hickey (Denis), Andy's brother and a minority shareholder of HRI, filed this action against Andy, alleging that Andy, in his roles as a director, officer, and controlling shareholder of HRI, had engaged in self-dealing and other misconduct over several years. Andy challenges remedies ordered by the trial court (1) amending HRI's articles of incorporation and bylaws to eliminate voting rights from the preferred shares—which, before the court's decision, had provided Andy with voting control of HRI—and (2) awarding $195,092.51 to HRI, which the court based upon its finding that Andy owed HRI for an "untrustworthy" payment made from HRI to H & H. Andy does not challenge the court's finding of his wrongful conduct.

We summarize the assignments of error and our conclusions as follows. Andy's first three assignments of error challenge the trial court's order that amended the articles of incorporation and bylaws of HRI as a means to eliminate voting rights from the preferred shares, which had the effect of replacing Andy with Denis as the controlling shareholder. We reject without published discussion Andy's second and third assignments and address Andy's first assignment, which contends that removal of voting rights from the preferred shares was not permitted under ORS 60.952 (allowing for remedies for shareholders of closely held corporations); we conclude that the trial court's remedy was legally impermissible. Andy's fourth assignment of error challenges the court's award of damages of $195,092.51 to HRI for loan repayments from HRI to H & H that were not supported by documentary evidence. Andy contends that Denis did not meet his burden of proving actual damages. We conclude that, in awarding damages, the trial court did not consider whether an offset

---

[1] Andy and H & H are referred to generally as Andy throughout this opinion, except where discussion specifically pertains only to H & H.

should be applied to the remedy for the self-dealing transaction between HRI and H & H to compensate for benefits that H & H had provided to HRI, and remand for the trial court to consider that issue. Finally, Denis cross-appeals, raising two assignments of error; we reject the first without published discussion, and address the second, which contends that the trial court made a calculation error in its award of damages regarding excess salary taken by Andy. The trial court's two letter opinions explaining the award are inconsistent, and we remand to the trial court to consider whether the evidence supports its second letter opinion, in which it stated that there was no excess salary in the amount of $12,000 for one of the years in question. Accordingly, we reverse and remand the general judgment.

## I. BACKGROUND

The father of Andy and Denis, Denis Hickey Sr. ("Denis Sr."), incorporated HRI, a ranching business, in 1972. Denis Sr. had six children, and the shares of voting common stock were divided equally among them. Each sibling also owned about 303 shares of voting preferred stock. Denis Sr. owned 3,849 shares of preferred stock, and in 1990, decided that Andy would be allowed to control HRI. He transferred his interest in HRI to a trust, and the trust entered into an agreement with Andy in which Andy would have the option to purchase a controlling interest in HRI for $266,600. Andy exercised his option to purchase the preferred shares in 1995, and the trust allowed him to purchase the stock in 10 yearly installments of $37,646.13, which would be paid from his salary as an officer of HRI. In 2006, Andy finally acquired all 3,199 of the shares covered by the stock purchase agreement and, at the time of trial, he owned a total of 3,602 shares (the purchased stock plus an additional 303 shares of preferred stock and 100 shares of common stock), giving him 52 percent voting control of the corporation. Some time before trial, Denis had acquired the common and preferred shares of his other siblings, which ultimately gave him ownership of 500 common shares and 1,515 preferred shares. 1,300 preferred shares remained with Denis Sr.'s trust and the estate of the mother of Andy, Denis, and their siblings. Denis paid $1 per share for the common shares that he acquired from his siblings.

In 2008, Denis, in his capacity as a shareholder of a closely held corporation, brought claims for remedies available under ORS 60.952 and for the imposition of a constructive trust for all of HRI's assets, alleging that Andy had breached his fiduciary duties by, among other things, systematically creating false charges for cattle feed provided by H & H, improperly making account entries in HRI's books, failing to pay any dividends, and borrowing money from HRI and manipulating the company's books to reflect that he had repaid the loan. The trial court did not determine that Denis had proved all of his allegations, but found that Andy, as the controlling shareholder, director, and officer of HRI, "basically treated HRI as his own in the extent of his operation of HRI." Andy also owned H & H, a cattle feed company, and the court found that it "is very clear that he has commingled assets of HRI and H & H and engaged in self dealing." Under ORS 60.952, the trial court set out a number of remedies as provided for in that statute, which included, among other things, that "HRI's articles of incorporation and bylaws shall be amended to remove voting rights from the preferred shares" and that Andy should be removed "from all position of leadership and control in HRI." The court explained in a letter opinion that it was

> "extremely concerned about the actions of [Andy] during the course of his control of the corporation and the very evident self dealing and commingling of assets. It is for this reason, that the court is ordering amendment of the bylaws and articles of incorporation and for the removal of [Andy] as controlling the activities of HRI."

The trial court also ordered a money damages award of $195,092.51 for a payment from HRI to H & H, apparently as a loan repayment, although HRI's account books did not properly document the loan. Additionally, the trial court determined that Andy had overpaid himself by $17,178.46 as a constructive dividend and caused a net tax damage to HRI of $14,397.67; it ordered Andy to repay HRI those amounts. We address the specifics of the factual circumstances of the remedies challenged in this appeal and cross-appeal in the respective sections for each assignment of error.

## II. DISCUSSION

### A. *Elimination of voting rights from the preferred shares*

Andy first assigns error to the trial court's removal of voting rights from the preferred shares. He argues that ORS 60.952(2)(b)[2] does not permit the elimination of voting rights, the effect of which deprives him of substantial value of his ownership interest in HRI. Although he concedes that ORS 60.952(2)(b) allows the trial court to alter or cancel provisions in the articles or bylaws, it cannot, according to him, do so in a manner that is unlawful. In Andy's view, the removal of voting rights by way of amending the articles of incorporation or the bylaws is the "functional equivalent" of a forced sale of a portion of the property rights associated with corporate shares. Thus, according to him, the stripping of voting rights is essentially a divestiture of his preferred shares, and, therefore, the trial court was required to follow the procedure of ORS 60.952(5), which, as explained in more detail below, provides for a judicially ordered share buyout.

Denis remonstrates that ORS 60.952(2)(b) allows for the remedy crafted by the trial court because, under subsection (2)(b), the trial court has broad powers to change any provision in the articles of incorporation or the bylaws. ORS 60.952(2)(b) provides that "[t]he remedies that the court may order in a proceeding under subsection (1) of this section include but are not limited to *** [t]he cancellation or alteration of *any* provision in the corporation's articles of incorporation or bylaws." (Emphasis added.) Denis contends that subsection (2)(b) "does not provide any limitation preventing the trial court from modifying provisions of the articles of incorporation or bylaws that relate to the voting rights of each class of stock." He also contends that the share purchase provision in ORS 60.952(5) is not applicable because there was no court-ordered share purchase and that Andy still owned the same number of preferred shares as he did before the judgment.

---

[2] ORS 60.952(2)(b) provides that the court may order "[t]he cancellation or alteration of any provision in the corporation's articles of incorporation or bylaws[.]"

In addition to his statutory challenge to the trial court's remedy, Andy argues that removal of voting rights from the preferred shares was not a remedy expressly sought in Denis's amended complaint and was, in fact, inconsistent with what Denis did seek: redemption of Andy's preferred shares or, alternatively, purchase of all of Denis's preferred shares. However, Denis requested *any* of the remedies available under ORS 60.952, so Andy's pleading argument goes nowhere and returns us to a question of what is permissible under the statute. We also find unavailing Andy's argument that stripping voting rights from the preferred shares is only allowed under ORS 60.952(2)(k) and ORS 60.952(5), which provide for a court-ordered purchase of *all* of a shareholder's shares.[3] The trial court's remedy allows for Andy to retain his preferred shares.

Nevertheless, elimination of voting rights from the preferred shares has the consequence of significantly reducing their value. In a market transaction, shares that do not confer majority control are discounted in value; in other words, they are subject to what is known as a "minority discount," which "recognizes that controlling shares are worth more in the market than are noncontrolling shares." *Columbia Management Co. v. Wyss*, 94 Or App 195, 204, 765 P2d 207, *rev den*, 307 Or 571 (1988) (citing *Baker v. Commercial Body Builders*, 264 Or 614, 507 P2d 387 (1973)). The discount may well be significant. In *Columbia Management, Co.*, for example, the discount was determined by an appraiser to be as much as 33 percent. 94 Or App at 198. Specifically here, Andy paid roughly $377,000 for the 3,199 shares that gave him the controlling interest in HRI. In contrast, Denis paid $1 per share for 400 of the voting shares of the common stock of his siblings—the same shares that give him control of HRI under the trial court's remedy. Moreover, stripping voting rights from the preferred shares adds value to Denis's common shares, because the owner of the majority of the common shares that retain voting rights will now control HRI under the trial court's remedy.

---

[3] ORS 60.952(2)(k) provides for "[t]he purchase by the corporation or one or more shareholders *of all of the shares* of one or more other shareholders for their fair value and on the terms determined under subsection (5) of this section[.]" (Emphasis added.)

In addition to the amendment of HRI's articles and bylaws to eliminate voting rights from the preferred shares, with the stated purpose of addressing the self-dealing in which Andy had engaged as the controlling shareholder of HRI, the trial court also ordered removal of Andy from all corporate offices and as a director of HRI, a remedy that Andy does not challenge. Although the trial court did not explain why it removed the voting rights in addition to removing Andy from direct control of HRI, we surmise that the intent was to prevent Andy from electing a director aligned with him or H & H, which would, therefore, allow him to retain control of HRI indirectly, and to prevent Andy from committing any further breaches of his fiduciary duties. The question presented here is whether elimination of voting rights, which consequently deprives Andy of significant value of his shares and inverts the controlling interest of HRI, is a permissible remedy under ORS 60.952(2)(b).

As illustrated below, in choosing among the remedies provided by ORS 60.952, the trial court has considerable discretion in deciding *which* of them suitably addresses the problem of deadlock or wrongful conduct in a closely held corporation. Nevertheless, we review as a matter of law, whether, given the circumstances before the court, a particular remedy is among those permitted by ORS 60.958. That is, in order to determine whether the trial court erred in removing the voting rights from the preferred shares under ORS 60.952(2)(b)—cancelling or altering the articles of incorporation or the bylaws—in the circumstances presented here, we must discern what the legislature intended when it enacted ORS 60.952. That task requires us to examine the statute's text and context and, if helpful, its legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin with the statutory text, "the best evidence of the legislature's intent," and its context, which includes "other provisions of the same statute and other related statutes." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). Also, "[i]n construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties." *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997).

Before we discuss the remedy at issue, we pause to note that the cancellation or alteration of provisions in the articles of incorporation or bylaws under ORS 60.952(2)(b) is one of the remedies available when the conditions set out in subsection (1)(b) and (d) are met. ORS 60.952(1) provides, in relevant part:

"(1)  In a proceeding by a shareholder in a corporation that does not have shares that are listed on a national securities exchange or that are regularly traded in a market maintained by one or more members of a national or affiliated securities association, the circuit court may order one or more of the remedies listed in subsection (2) of this section if it is established that:

"* * * * *

"(b)  The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent;

"* * *; or

"(d)  The corporate assets are being misapplied or wasted."[4]

Oregon courts have recognized that controlling shareholders have fiduciary duties to minority shareholders. *See, e.g., Naito v. Naito,* 178 Or App 1, 20, 35 P3d 1068 (2001) ("Majority or other controlling shareholders owe fiduciary duties of loyalty, good faith, fair dealing and full disclosure to the minority."). Conduct that violates those fiduciary duties in a closely held corporation is likely to be considered "oppressive."[5] *Id.*

---

[4] Remedies are also available under ORS 60.952(1) if directors or shareholders are deadlocked:

"(a) The directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock;
"* * * * *

"(c) The shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired[.]"

[5] At the time *Naito* was decided, ORS 60.952 had not been enacted and we were referring to oppressive conduct under ORS 60.661(2)(b), which provides for dissolution of a corporation if "[t]he directors or those in control of the corporation

As noted, the trial court ordered that the articles of incorporation and bylaws be altered to strip the voting rights from the preferred shares. ORS 60.952(2)(b) provides:

> "(2) The remedies that the court may order in a proceeding under subsection (1) of this section include but are not limited to the following:
>
> "* * * * *
>
> "(b) The cancellation or alteration of any provision in the corporation's articles of incorporation or bylaws."

On its face, that subsection suggests that the trial court can modify any provisions of the articles of incorporation or bylaws without limitation. However, cancelling or altering a provision in the articles or bylaws constitutes a "remedy." *See* ORS 60.952(1) ("[T]he circuit court may order one or more of the remedies listed in subsection (2) of this section * * *."); ORS 60.952(2) ("The remedies that the court may order in a proceeding under subsection (1) of this section include * * *."). The ordinary meaning of remedy is "the legal means to recover a right or to prevent or obtain redress for a wrong : the relief (as damages, restitution, specific performance, an injunction) that may be given by a court for a wrong." *Webster's Third New Int'l Dictionary* 1920 (unabridged ed 2002); *see also Black's Law Dictionary* 1294 (6th ed 1990) ("The means by which a right is enforced or the violation of a right is prevented, redressed, or compensated."); *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 99, 23 P3d 333 (2001) ("[I]t would be 'in vain' for the law to recognize rights, if it were not for the remedial part of the law that provides the methods for restoring those rights when they wrongfully are withheld or invaded." (quoting 1 William Blackstone, *Commentaries on the Laws of England*)). In this context, the "wrong" is oppressive conduct (or one of the other conditions set out in subsection (1)) in a closely held corporation. Accordingly, the "remedy" addresses the particular conduct that occurred—a breach of the controlling shareholder's

___

have acted, or acting or will act in a manner that is illegal, oppressive or fraudulent." The text of ORS 60.952(1)(b) mirrors closely that language and, as we explain below, cases involving oppression were solely decided under ORS 60.661 until ORS 60.952 was enacted.

fiduciary duties. Consequently, a trial court's ability to order a remedy under ORS 60.952 is not without limit: The remedy must correspond to the wrong—or the legally recognized right—for which the remedy is provided under ORS 60.952.

In addition to the remedy that allows the alteration or deletion of a provision of a corporation's articles or bylaws, ORS 60.952(2) provides for a number of other remedies to address the problem of oppression in closely held corporations. Some of those include "[t]he removal from office of any director or officer[,]" ORS 60.952(2)(c); "[t]he appointment of any individual as a director or officer[,]" ORS 60.952(2)(d); "[t]he appointment of a custodian to manage the business and affairs of the corporation, to serve for the term and under the conditions prescribed by the court[,]" ORS 60.952(2)(f); "[t]he appointment of a provisional director to serve for the term and under the conditions prescribed by the court[,]" ORS 60.952(2)(g); and "[t]he retention of jurisdiction of the case by the court for the protection of the shareholder who filed the proceeding[,]" ORS 60.952(2)(L).

The statute contains additional guidance for courts in devising appropriate remedies. For example, "[t]he remedies set forth in subsection (2) * * * shall not be exclusive of other legal and equitable remedies that the court may impose." ORS 60.952(3). In addition, "[i]n determining the appropriate remedies to order under subsection (2) * * *, the court may take into consideration the reasonable expectations of the corporation's shareholders as they existed at the time the corporation was formed and developed during the course of the shareholders' relationship with the corporation and with each other." ORS 60.952(4). Also, as amplified below, a court-ordered share purchase for fair value, which has been Oregon courts' preferred remedy for oppression in closely held corporations, is included among the possible remedies for oppression, under ORS 60.920(2)(k), and the procedure and methodology for a share purchase is set forth in subsection (5).

Before the legislature enacted ORS 60.952 in 2001, ORS 60.661, which provides for judicial corporate dissolution, was the sole statutory means for addressing

oppression or other misconduct in closely held corporations. Robert Art, the chair of the Oregon State Bar Task Force on Close Corporations and Shareholder Rights, which had been charged with drafting the bill that became ORS 60.952, testified before the House Committee on Judiciary, Subcommittee on Civil Law that

"[c]urrently, the Oregon [Business Corporation] Act provides only one remedy, which is dissolution by judicial order of the corporation. That's typically the worst remedy available, both for the plaintiff and the corporation and for the economy. Courts virtually never provide that remedy and shouldn't. They provide other remedies instead, but you can't find any evidence of that in the statute. *The statute will now codify those remedies.*"

Tape Recording, House Committee on Judiciary, Subcommittee on Civil Law, SB 118, May 2, 2001, Tape 89, Side A (statement of Robert Art) (emphasis added). Further testimony explained that if "the statutory threshold for being entitled to a remedy is reached, then the Bill specifies additional remedies as alternatives to dissolution based upon actual remedies that have been imposed by courts." Testimony, House Committee on Judiciary, Subcommittee on Civil Law, SB 118, May 2, 2001, Ex D (statement of Andrew Morrow, Jr., Business Law Section, Oregon State Bar).

Art also addressed the difficulties present in close corporations—namely, that controlling shareholders have a great deal of power to damage the interests of the minority and that minority shareholders are trapped because their shares are difficult to sell due to the absence of a publicly traded market. Testimony, Senate Committee on Business, Labor and Economic Development, SB 116, Jan 15, 2001, (later incorporated into SB 118), Tape 2, Side A (statement of Robert Art). ORS 60.952, he explained, was designed to address those difficulties:

"[ORS 60.952] encourages the courts to use the buyout remedy, which is the most common and the most logical, by specifying a procedure for the buyout. It makes clear that dissolution is not the preferred remedy. In fact, it's the last resort, to be used only if the others are not effective. In

choosing a remedy, the courts may consider the reasonable expectations of the shareholders as they were at the outset of the business and as they developed over the course of the business."[6]

*Id.* Likewise,

"[c]ourts provide various remedies, suited to the circumstances. Most common is an order compelling the buyout of shares at a fair price and fair terms determined by the court. Alternately, a court may compel the issuance of a dividend or of shares of stock, designate directors, officers, custodians or receivers, or provide mediation or other dispute resolution."

Testimony, Senate Committee on Business, Labor and Economic Development, SB 116, Jan 15, 2001, Ex A (statement of Andrew Morrow, Jr., and Robert Art).

Thus, the legislative history suggests an intention to provide statutory remedies to address instances of oppression and other misconduct in close corporations and to reflect or codify remedies that Oregon courts had previously recognized and granted. The most common remedy, which the statute apparently was designed to encourage, was a court-ordered share buyout, facilitated by a procedure and considerations that are specifically set out in ORS 60.952(5). *See, e.g., Cooke v. Fresh Express Foods Corp.*, 169 Or App 101, 108-09, 7 P3d 717 (2000) (describing a court-ordered share purchase under ORS 60.661 as "lesser appropriate relief") (citing *Baker*, 264 Or at 631-32). In other words, ORS 60.952 was not intended to institute a menu of remedies irrespective of Oregon case law but was enacted to reflect judicial practice.

A brief review of that judicial practice thus provides further context for interpreting ORS 60.952. Case

---

[6] Art also explained that, in addition to the court-ordered share purchase set out in ORS 60.952(5), ORS 60.952(6)

"provides a means to bring the litigation to an early end. Any of the defendants or the corporation can make an offer at an early stage of the litigation to buy the shares of the aggrieved shareholder. Once the offer is made, it's binding. The shares are then purchased at the price the parties agree to or, if they cannot agree, at a price determined by the courts to be fair."

Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 116, Jan 15, 2001, (later incorporated into SB 118), Tape 2, Side A (statement of Robert Art).

law before its enactment reflects the provision of equitable remedies that were "appropriate" to the particular circumstances, affording no more relief than was necessary to address and solve the problems caused by the wrongful conduct at issue. For example, in *Browning v. C & C Plywood Corp.*, 248 Or 574, 575, 434 P2d 339 (1968), the Supreme Court considered circumstances in which the majority shareholders recapitalized the corporation by increasing the issued stock to the extent that it virtually eliminated the plaintiff minority shareholder's 32 percent interest in the corporation. Although concluding that the controlling shareholder's actions were "wrongful and oppressive," the court nevertheless stated that it would be "untenable" to grant the minority shareholder's requested relief, which was to appoint a receiver and dissolve the corporation. *Id.* at 581-82. It noted, instead, that the "most obvious relief would be to cancel the stock increase and restore the stockholders to their former proportionate status." *Id.* at 582. The court, however, considered the interests of the controlling shareholders, despite their "wrongful and oppressive" conduct, when it recognized that, because some of them had pledged their stock to third parties and had paid consideration for their increased shares, the "evidence [was] not sufficient to enable [the court] to determine what the precise relief should be" and instructed the trial court to consider additional evidence in order to determine "the appropriate relief." *Id.* The court proposed that, if a stock cancellation was untenable, the trial court could allow the minority shareholder the means to purchase enough stock to return him to his 32 percent interest in the corporation. *Id.*

In *Baker*, Oregon's seminal shareholder-oppression case, the majority shareholders excluded the minority shareholders, a husband and wife, from participation in the corporation by terminating the husband's one-day-per-week employment and, for a time, preventing them from examining corporate records and failing to notify them of corporate meetings. 264 Or at 618-23. The Supreme Court concluded that some of the defendants' conduct was oppressive and identified a number of equitable remedies alternative to dissolution that could be appropriate in an oppressive conduct

case, "[d]epending upon the facts of the case and the nature of the problem involved." *Id.* at 631-32, 638.[7] However, when those remedies were considered in light of the conduct or the "'specific acts of wrongdoing'" alleged by the plaintiffs, some of which the court noted had ceased, the alternative remedies identified were not "appropriate." *Id.* at 638.

In *Naito*, the defendants failed "to provide for adequate dividends or other financial benefits on reasonable terms" and therefore, as the controlling shareholders, breached their fiduciary duties. 178 Or App at 24. The plaintiffs challenged the trial court's order to increase dividend distributions to the shareholders and instead argued that a

---

[7] Those suggested alternative remedies were:

"(a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;

"(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or 'oppressive' conduct ceases;

"(c) The appointment of a 'special fiscal agent' to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;

"(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or 'special fiscal agent';

"(e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;

"(f) The issuance of an injunction to prohibit continuing acts of 'oppressive' conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;

"(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;

"(h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;

"(i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;

"(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of 'oppressive' conduct by the majority in control of the corporation."

*Baker,* 264 Or App at 632-33 (footnotes omitted).

divisive reorganization of the family business or a compulsory buyout would be the appropriate remedy. *Id.* at 25-26. We concluded that "the oppressive conduct is [not] so egregious that it requires the drastic remedy of a compulsory purchase or divisive reorganization. *** We agree with the trial court that the proper remedy is to keep the business together for the benefit of all the shareholders but to require it to pay reasonable dividends." *Id.* at 26. However, we adjusted the remedy because the trial court did not give adequate weight to a recent board decision regarding determination of the amount of dividends that reflected an exercise of its business discretion; we noted that "it is not [the court's] role to second-guess business decisions that are within the range of reasonableness." *Id.* at 27-28. In concluding that the trial court had improperly substituted its judgment for the board's, and in approving the policy that the board had adopted, we nevertheless determined that, in light of the long-standing hostilities between the parties, the trial court could retain jurisdiction over the matter to ensure that the defendants adhered to the board-adopted dividend policy. *Id.* at 28-29.

Often the appropriate remedy has been a court-ordered share purchase, which is now provided for in ORS 60.952(5). In general, in ordering a share purchase, the court determines a "fair value" for the shares; such a determination considers the interests of both the purchaser, usually the controlling shareholder, and the seller, usually the minority shareholder. For example, in *Delaney v. Georgia-Pacific Corp.*, 278 Or 305, 324, 564 P2d 277 (1977), the defendants had effectively ousted the minority shareholder plaintiffs from management of the corporation. The plaintiffs sought an order requiring a share purchase at a "fair and equitable price," which, in the plaintiffs' view, would be based on a 10-year projection of anticipated profits that had been prepared in support of a bank-financing application. *Id.* at 325. The Supreme Court found that projection to be "far too speculative" as a basis for relief but concluded that the appropriate relief was a purchase of the plaintiffs' stock at a fair price based on the valuation of the corporation when the defendant took over its management and which took into

account excessive interest that had been charged to the corporation. *Id.*[8]

Finally, in *Cooke*, where the defendants breached their fiduciary duties toward the plaintiff, a minority shareholder, by withholding dividends and the benefit of a salary as an officer and employee of the corporation, the defendants challenged the trial court's determination of fair value for the price paid in a court-ordered share purchase. 169 Or App at 103-06. We concluded that it was correct to value the corporation as an ongoing profitable business rather than using its liquidation value. *Id.* at 114. We also concluded that it was correct to include the plaintiff's unpaid wages in determining the value of the shares; the plaintiff's employment was an important benefit of ownership in the corporation.[9] *Id.*

In sum, under Oregon case law prior to the enactment of ORS 60.952, remedies consistently matched the specific acts constituting breach of a controlling shareholder's fiduciary duties and the particular circumstances of the closely held corporation affected. In considering appropriate relief, judicial practice avoided penalizing controlling shareholders' ownership interests in a manner that significantly departed from what was required to relieve minority shareholders from the oppressive conduct, and also avoided increasing any value or benefit from a minority shareholders' interest beyond what minority shareholders

---

[8] ORS 60.952(5), which sets out a procedure for a court-ordered share purchase, codified how Oregon case law had arrived at providing fair value compensation. First, subsection (5)(a)(A) provides that, when ordering a share purchase, the court must "[d]etermine the fair value of the shares * * * taking into account any impact on the value of the shares resulting from the actions giving rise to a proceeding under subsection (1) of this section[.]" Thus, the share purchase requires that "fair value" be paid, a principle that had previously been developed in Oregon law, *see, e.g., Hayes v. Olmsted & Assoc., Inc.*, 173 Or App 259, 21 P3d 178 (2001); *Cooke*, 169 Or App at 115, and which, it suffices to say, is a determination that accommodates the interests of both the buyer and seller, the controlling shareholder and the minority shareholder.

[9] The concept that a remedy can accommodate benefits particular to the circumstances of a close corporation, such as a salary from employment, is captured in ORS 60.952(4), which provides that, in determining the appropriate remedy under the statute, the court has discretion to "take into consideration the reasonable expectations of the corporation's shareholders as they existed at the time the corporation was formed and developed during the course of the shareholders' relationship with the corporation and with each other."

could reasonably expect or the fair value of the shares. In codifying the remedies that Oregon courts had provided as an alternative to judicial dissolution, the legislature apparently did not intend to abandon the equitable considerations inherent in those established remedies.

Here, the trial court eliminated the voting rights from the preferred shares, which significantly discounted the value of Andy's preferred shares. Although the trial court's remedy, in addition to the court's order prohibiting Andy from acting as a director or officer of HRI, ensures that Andy will no longer engage in self-dealing and commingling of assets between HRI and H & H, it does not appropriately correspond to the identified wrongful conduct. Andy obtained the preferred shares, which gave him voting control, by executing an agreement with Denis Sr.'s trust that provided for Andy to pay over time in installments for the voting preferred shares by drawing a salary from HRI. The trial court did not find that his preferred shares were wrongfully obtained. Rather, the nature of the problem identified by the trial court is Andy's oppressive conduct, namely, his self-dealing and commingling in his role as the controlling shareholder at the expense of the interests of the corporation and Denis, and the risk that Andy will continue that oppressive conduct. That conduct and potential future conduct is more properly addressed by a remedy that does not also significantly diminish the value of Andy's ownership interest in HRI, given that the trial court has available a number of other remedies that can adequately address the wrongful conduct.

Moreover, the trial court's remedy provided the majority owner of the common shares (Denis) with control of HRI, which inverted HRI's ownership structure and thereby increases the value of Denis's common shares and gives him a windfall. Additionally, although the trial court has discretion to consider the "reasonable expectations" of Denis as the plaintiff minority shareholder under ORS 60.952(4), control of HRI by virtue of owning the majority of common shares is not something that Andy, Denis, or Denis Sr. could have reasonably expected.

Accordingly, we instruct the trial court to devise a remedy more appropriate to the wrongs it seeks to redress. To be sure, some potential remedies for self-dealing, such as appointing a custodian to manage HRI's affairs, may be too expensive, or may require continuing court jurisdiction to ensure compliance. The trial court can, however, order a share purchase for fair value under ORS 60.952(2)(k) and (5), which would extricate either Denis or Andy from HRI, if it determines that other available remedies are not practical means of addressing Andy's specific acts of wrongdoing.

B. *Loan repayment to H & H*

In Andy's fourth assignment of error, he challenges the damages award of $195,092.51, which was related to payments by HRI to H & H out of the proceeds of a refinancing of property owned by HRI. Specifically, the trial court made the following findings:

> "3) The Johnson property refinance creates a situation under which Denis claims that Andy owes $193,772.51. Briefly, it appears that the Johnson property was refinanced, which resulted in excessive funds being borrowed by HRI in the approximate sum of $200,000.00.
>
> "HRI then paid to H & H the sum of $195,092.51, which is registered on the books as a loan paid in full although it created an overpayment of over $91,000.00. After the overpayment was created a journal entry created a debt of HRI to H & H in the amount of the overpayment. Also, the books do not show a loan owing from HRI to H & H at the time the money was turned over to H & H.
>
> "The court agrees that this self dealing transaction is untrustworthy and the court finds by a preponderance of the evidence that Plaintiff owes Defendant [*sic*] the sum of $195,092.51 regarding the Johnson refinance transaction."

After Denis conceded that the judgment creditor should be HRI, not him, the general judgment was amended to provide the award to HRI. Both Andy and H & H were determined to be the judgment debtors.[10]

---

[10] Although Andy challenged the judgment against H & H in his objections to the form of judgment, in which he argued that H & H was not in privity of contract with Denis (ultimately the judgment awarded damages to HRI, not Denis),

Denis adds context to the trial court's findings by pointing out that his trial expert, a forensic CPA, testified that the journal entries for the transactions at issue were documented in an unusual manner. On December 30, 2004, the account on its book, labeled "Loan Payable to H & H," had a zero balance. A day later, HRI refinanced one of its real property holdings, which generated more than $200,000 in proceeds for HRI. That same day, the journal entry for the account was increased by $82,620.40, described, in part, as "cattle sales." Denis posits that no documentary evidence supports that a cattle sale occurred in that amount. In another transaction, on January 25, 2005, HRI made a $173,772.51 payment to H & H in the form of a check describing its purpose as "loan paid in full, 1998-1/25/05." According to HRI's books, that payment was an overpayment of $91,152.11. Six days later, another journal entry increased the amount of the loan payable to H & H by $91,152.11, describing the entry as "feed expense." Again, Denis contends that the transaction lacked any documentation. That evidence, in his view, is sufficient to support the trial court's conclusion that the payment from HRI to H & H was improper and, therefore, it was not error to order the entire amount of the payment as repayment to HRI.

For his part, Andy contends that Denis only offered expert testimony that there were insufficient records to support those transactions. He elaborates that, although the evidence was sufficient to support the trial court's determination that Andy had failed to properly document the transactions between HRI and H & H, "the record does not support any finding of actual damages." Although Andy insists that it was Denis's burden to prove that cattle and feed sales did *not* occur during the periods preceding the payments so denoted, Andy presented evidence that they did occur. According to Andy, HRI suffered financial difficulties from 2001 to 2003 and was unable to provide enough cattle feed to its herd, so he and H & H made up the difference. Andy points to evidence that includes accumulated unpaid feed bills from 2001 to 2003 that were due to financial difficulties faced by HRI during those years; his testimony and HRI tax statements

---

neither Andy nor H & H assigns error to the trial court's determination that H & H was jointly and severally liable for the award to HRI.

that support his contention that H & H sold cattle to provide money to HRI; and records that showed that feed bills for the HRI herd were far below the average for the feed bills in later years for roughly the same number of cattle.

Andy also argues that Denis was foreclosed from bringing a derivative claim for damages because that claim, which existed in his original amended complaint, was stricken. We are not persuaded. Denis's first amended complaint alleged both a derivative claim and a claim under ORS 60.952. Andy's ORCP 21 motion to dismiss was granted as to the derivative claim, but Denis's claim under ORS 60.952 alleging that Andy breached his fiduciary duties as a controlling shareholder, director, or officer of HRI remained in his second amended complaint, which also sought any of the remedies available under ORS 60.952. Andy has not argued that the award of damages was an impermissible remedy under ORS 60.952.

ORS 60.952(1)(b) provides remedies if "directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent[.]" With regard to self-dealing, the Oregon Business Corporation Act has a provision that concerns a director's conflicts of interest, ORS 60.361(1), which defines a conflict-of-interest transaction as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest." ORS 60.361(1) provides, in part:

> "A conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:
>
> "(a)  The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved or ratified the transaction;
>
> "(b)  The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved or ratified the transaction; or
>
> "(c)  The transaction was fair to the corporation."

A director has an indirect interest in a transaction if the director "has a material financial interest" in another entity that benefits from the transaction. ORS 60.361(2)(a).

Formerly, directors and officers were prohibited from contracting with their corporation because of their fiduciary duties unless a majority of disinterested directors approved the transaction or the shareholders ratified the transaction. *American Timber v. Niedermeyer*, 276 Or 1135, 1146, 558 P2d 1211 (1976); *see also Naito*, 178 Or App at 20, 20 n 26 (stating that directors owe similar duties to the corporation and that, in the context of oppression, the distinction between directors and shareholders "may not be of great significance"). ORS 60.361 reflects a change in the common law "toward enforcing contracts which otherwise would be voidable because of the relationship of the contracting officer or director to the corporation if, upon close scrutiny, the transaction is affirmatively shown to be fair to the corporation." *American Timber*, 276 Or at 1146. The rule was codified by the former version of ORS 60.361, ORS 57.265. *Id.* at 1146 n 7 ("[ORS 57.265] was adopted in 1975 and, therefore, is not directly applicable to the transaction involved in this appeal. However, that statute is a codification of a trend in the case law toward a more liberal view of contracts between a corporation and its officers or directors which is more in keeping with needs and practices of modern business life."). Thus, a self-dealing transaction is not *per se* void, but, instead, voidable; the director who participated in the transaction may render it permissible by obtaining approval from other directors or the shareholders, or the director can show that the transaction was fair to the corporation.

Moreover, the Supreme Court held in *American Timber*, that even when a conflict-of-interest transaction is not "fair and reasonable," it is nevertheless allowable to consider as an "offset" any actual benefit conferred to the corporation in the self-dealing transaction. *Id.* at 1149. The court concluded that an exchange agreement between the defendant (the majority shareholder and a director) and the corporation was "unauthorized and improper and that the assets which [the defendant] received from the corporation should be returned." *Id.* at 1148-49. The exchange

agreement involved the defendant exchanging his ownership interest in a number of businesses, whose value he may have grossly overstated as $165,000, for at least $220,000 worth of the corporation's physical assets. *Id.* at 1147. The court remanded the issue of damages so that the trial court could determine the value of the defendant's ownership interest as an offset against the trial court's judgment awarding damages. *Id.* at 1149. The court also stated that it was the defendant's burden to prove the value of the companies. *Id.*

Similarly, in *Naas v. Lucas*, 86 Or App 406, 408, 739 P2d 1051 (1987), the plaintiffs alleged that the defendant, a minority shareholder, officer, and director of the corporation, breached his fiduciary duties and violated ORS 57.265 (now, ORS 60.361) by distributing assets of the corporation to himself and a company in which he had a financial interest. The trial court denied the plaintiffs' motion for a directed verdict on the breach of fiduciary duty claim, and, on appeal, we reversed because the defendant had not met his burden of proving that the transaction was "'fair and reasonable to the corporation'" and because the trial evidence showed that the transaction was "manifestly unfair to the corporation and its other stockholders." *Id.* at 410-11. We concluded that the transaction was void and reversed but did not remand for the trial court to determine the amount of damages because damages were not in dispute. *Id.* at 411-12.

Together, *American Timber* and *Naas* establish that a director alleged to have engaged in a conflict-of-interest transaction has the burden of proving that the transaction, if it was not approved by the board of directors or the shareholders, was fair to that corporation, and further, if the transaction is determined to be void and damages are at issue, it is the self-dealing director's burden to prove any amount that was a benefit to the corporation in the voided transaction. Although ORS 60.952, not ORS 60.361, was the basis for Denis's claim that Andy breached his fiduciary duty, an action under ORS 60.952 does not obviate the application of the modern principle that the issue of damages in the wake of a voided transaction is open to evidence of any benefit of the transaction received by the corporation that may offset an award of damages.

Andy does not contend that the trial court erred in determining that he impermissibly engaged in self-dealing when he made the payments to H & H immediately after the refinancing. That determination is sufficient to support the trial court's decision to void the transactions and award damages to HRI. He does, however, contest the trial court's award of damages to HRI without apparently taking into account benefits provided to HRI by H & H. But Andy misplaces the burden of proving cattle and feed sales, arguing that it was Denis's burden to prove that those sales to HRI took place; instead, it is Andy's burden to establish any offset. *See American Timber*, 276 Or at 1149. However, the court erred when it ordered damages in the full amount of the $195,092.51 payment from HRI to H & H without explicitly considering whether the cattle and feed sales offset the damages award. Accordingly, we direct the court, on remand, to make a finding that addresses the persuasiveness of Andy's evidence, or any additional evidence, that cattle, feed, or other benefits were provided to HRI by H & H in order to determine whether Andy is entitled to an offset.[11]

C.  *Excess salary*

Denis argues in his cross-appeal that the trial court erred when it calculated that excess salary drawn by Andy in 2001, 2002, and 2005 totaled in the amount of $17,178 instead of $29,178, positing that the lesser amount is not supported by evidence in the record. In its letter opinion, the trial court found

"that Andy violated the stock purchase option by overpayment of his salary and by issuing a dividend to himself to

---

[11] Andy contends that, because Denis's derivative action claim for money damages, specifically relating to cattle and feed sales, was stricken, the trial court was precluded from awarding damages. Although Andy concedes that the court could rescind the transaction under ORS 60.952(2)(a), which allows "[t]he performance, prohibition, alteration or setting aside of any action of the corporation or of its shareholders, directors or officers or any other party to the proceeding[,]" he posits that the court could not award damages as a consequence of the rescission. In this case, rescission without a return to HRI of money paid to H & H would not remedy the harm caused to HRI. As noted in our discussion of the previous assignment of error, 269 Or App at 264, any and all of the remedies permitted under ORS 60.952 remained in the subsequent amended complaint, which include "[t]he award of damages to any aggrieved party[,]" ORS 60.952(2)(j), and any "other legal and equitable remedies that the court may impose[,]" ORS 60.952(3).

the detriment of HRI. It is very clear in the stock option agreement that it was the intention that Andy be allowed to purchase the stock option with monies earned from HRI in the form of a salary not to exceed $37,651.13 per year. In 2001 and 2002, Andy overpaid himself the sum of $12,000.00 and in 2005 overpaid the amount of $5,178.46.

"* * * Therefore, for over payment of salary, judgment is owed in favor[] of Denis and against Andy in the sum of $17,178.46."

After Andy's objections to the original form of judgment, the court, by letter, responded:

"It is the court's recollection that the judgment amount of $31,576.13 [(the amount includes a $14,397.67 damages award for a net tax damage not contested by the parties on appeal)] coincides with the court's opinion at the time the court originally issued its decision letter in this matter. Although the court made a finding of money taken in two years in the sum of $12,000 *for each year*, it is the court's recollection that I left off a $12,000 amount and had reason to do so. Quite frankly, without all the exhibits available to the court I cannot remember what the reason is. However, I am going to sustain [Andy]'s objection to the increase of the judgment from $31,576.13 against Andy Hickey to the sum of $43,576.33. Therefore, total judgment for that specific area of the money awards is the sum of $31,576.13."

(Emphasis added.) Thus, instead of characterizing the total amount in the first letter opinion as a mathematical error, the court in its second letter stated that it had reason for not including the second of two overpayment amounts of $12,000, but it could not articulate the reason.

Denis posits that the trial court's first finding was correct—that there were two years of $12,000 salary over-payments—and urges us to correct the mathematical error. He further contends that his expert witness demonstrated an excess for both years. In response, Andy argues that the court found that Andy did not take excess payment in 2001, as demonstrated by Andy's expert. In fact, the trial court stated that, "[i]n 2001 and 2002, Andy overpaid himself the sum of $12,000.00" and then stated in its second letter that it had a reason for finding overpayment for only one of those years, but could not say what the reason was. That

inconsistency requires the court to determine the correct amount on remand.[12]

In conclusion, we reverse and remand the general judgment with instructions to the trial court to determine an appropriate remedy for Andy's self-dealing without the collateral result of significantly reducing the value of Andy's preferred shares or increasing the value of Denis's common shares. Further, the court should consider the evidence presented by Andy regarding the value of the cattle and cattle feed that H & H provided to HRI and should determine whether an offset against the $195,092.51 damages award is appropriate. Finally, the court should resolve the discrepancy between the findings in its two letter opinions regarding the excess salary.

Judgment reversed in part and remanded on appeal and cross-appeal.

---

[12] We allow for the possibility that, on remand, the court could conclude that its first letter finding a sum of $12,000 is consistent with its second finding if "[i]n 2001 and 2002, Andy overpaid himself the sum of $12,000" is read as meaning the sum of $0 for one year and $12,000 for the other year.